**William Henry FLAMER, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: March 26, 1990.
Decided: Dec. 21, 1990.

738

740

John Williams of Schmittinger and Rodriguez, Dover, for appellant.

Gary A. Myers (argued), and Charles E. Butler, Deputy Attys. Gen., Dept. of Justice, Wilmington, for appellee.

Before CHRISTIE, Chief Justice, HORSEY, MOORE, WALSH, and HOLLAND, Justices, constituting the Court en banc.

CHRISTIE, Chief Justice.

The defendant/appellant, William Henry Flamer, was convicted of four counts of murder in the first degree and one count each of robbery in the first degree, possession of a deadly weapon during the commission of a felony, and misdemeanor theft. On the four counts of murder in the first degree, the jury, in a separate hearing following the guilt/innocence phase of trial, recommended the death penalty which was imposed by Superior Court. On direct appeal to this Court, Flamer's convictions and sentences were affirmed. *Flamer v. State*, Del.Supr., 490 A.2d 104 (1983) *cert. denied* (guilt phase) 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983), *cert. denied* (penalty phase) 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985) (*Flamer I*). This appeal arises out of Flamer's second application for postconviction relief in the Superior Court, which was denied by that court after an evidentiary hearing and extensive briefing. *State v. Flamer*, Del.Super., Cr.A. Nos. IK79–11–0236–R1, 0237–R1, 0238–R1, 0239–R1, Ridgely, J., 1989 WL 70893 (June 16, 1989) (Memorandum Opinion). On appeal, Flamer raises six contentions. We find the contentions to be without merit and affirm the decision of the Superior Court.

A comprehensive statement of facts relevant to Flamer's crime and conviction is contained in this Court's opinion on direct appeal, *Flamer I*, 490 A.2d 104. A brief summary of those facts and additional facts necessary to address the present appeal follow.

During the night of February 6, 1979, Byard and Alberta Smith, an elderly couple, were murdered in their home in Harrington, Delaware. Autopsies showed that Byard Smith suffered 79 stab wounds and that his wife had been stabbed 66 times. Alberta Smith's purse was opened and emptied. Various frozen foods, a tele-

vision, a fan, Byard Smith's wallet, and the couple's automobile were missing from their home.

Flamer was a nephew of the victims and lived approximately 150 yards away from the Smith residence. An individual matching his description was seen near the Smiths' car in the Felton area the following morning. A Felton store clerk identified Flamer as having been in the store that morning. When a description of the suspect was given to the Smiths' daughter, she identified Flamer by name, and a warrant for his arrest was issued.

On February 7, 1979, the police went to Flamer's residence and received his grandmother's consent to search for him. They entered his bedroom and found a box of frozen food wrapped in the same way as the food which was still at the Smith house. Analysis later showed Byard Smith's fingerprint on one of the food bags. The police found the Smiths' television set and fan in a closet in Flamer's residence. They seized a bayonet and scabbard. They saw on the bayonet what was later found to be human blood, and fibers which were microscopically similar to fibers from the clothing worn by Alberta Smith when she died. Flamer was not present at his residence.

Later that day, Delaware State Police officers arrested Flamer along with two codefendants. The State Police took him to Troop 5 in Bridgeville, Delaware. Spatterings of what appeared to be blood were visible on Flamer's overcoat and under his fingernails, and fresh scratches were on his neck, chest, and torso. One of the codefendants, Andre Deputy, also had scratches on him and carried Byard Smith's wallet and pocket watch.

At his postconviction relief hearing on May 11, 1988, Flamer testified that while being transported to Delaware State Police Troop 5, he asked to telephone his mother to see if he could retain the services of Herman Brown, Sr., an attorney known to his family. At Troop 5, Flamer and Deputy were questioned both individually and together during the afternoon. Flamer was advised of his *Miranda* rights on several occasions during the period, and on each occasion, he indicated a willingness to

speak to the police without an attorney being present.

Flamer's first explanation for the blood on his clothing was that Deputy woke him and summoned him to the Smith residence to assist in removing the frozen foods from the house. In doing so, Flamer discovered that the Smiths had been murdered and that blood was on the frozen foods. While Flamer was relating this story, Deputy told the police that Flamer had given him Byard Smith's wallet and watch. When confronted with Deputy's inconsistent statement, Flamer changed his story and said that he, Deputy, and an alleged second accomplice had gone to the Smiths' house and that the alleged second accomplice had stabbed the victims and handed the food to Flamer, thus accounting for the blood on Flamer.

Questioning ceased at approximately 7 p.m. on February 7, 1979, and Flamer remained overnight at Troop 5. The next morning, the police took Flamer to Justice of the Peace Court No. 6 in Harrington, Delaware, for his initial appearance before a magistrate. At that time, Flamer advised Magistrate A. Tyson Cohee that he wished to make a telephone call to his mother in order to inquire about bail and possible representation by counsel. Magistrate Cohee advised Flamer that he could make a telephone call, but that he would appoint the public defender to represent him in any event.[1] Flamer asked if that

1. While at the Justice of the Peace Court, the following Application and Order Appointing Counsel was executed:

The defendant, having appeared before this Court on a charge of:

| | | | |
|---|---|---|---|
| 636 | 1447 | 832 1 & 2 | 1447 |
| 841 | 832 1 & 2 | 636 |

in violation of Title 11, Section 826 i & 2, and having been advised of his right to a preliminary hearing and right to counsel, requests appointment of counsel and has sworn to the following:

- Employed: Yes _____ No X
- If yes, weekly wages are: $ _____
- If self-employed, average weekly income is: $ _____
- Cash on hand and in banks: $ _____
- Number of dependents: 1
- Property owned: none
- Outstanding mortgages and other personal loans:

Sworn to before me this
_8_ day of _Feb._ , 1979,

x/s/ William H. Flamer

Defendant

147 Mispillion St.

/s/ A. Tyson Cohee

Harrington, Del. 19952

_____
Telephone Number

This Court now finds that the defendant is financially unable to obtain counsel, and said defendant not having waived the appointment of counsel:

IT IS ORDERED THIS _8_ day of _Feb_ , 1979 that the Public Defender of the State of Delaware represent the defendant before this court, or other court, in all matters hereafter, unless and until relieved by order of a higher court.

/s/ A. Tyson Cohee

Justice of the Peace

meant he could not make the telephone call, and he was told it did not. Flamer telephoned his mother to ask if she knew of an attorney to represent him. After she gave a negative response, Flamer asked her to come to the Justice of the Peace Court. Delaware State Police Officer William H. Porter advised Flamer that they would soon be returning to Troop 5 and that she should arrange to see him there.

Flamer was then taken back to Troop 5 and placed in a cell for approximately twenty minutes. His mother arrived to see him, and Flamer was released to meet briefly with her. After his mother left, Flamer was returned to the cell. Officer Porter then initiated a conversation with him, which led to a tape recorded statement.[2] At no time prior to or during the taped statement did Flamer tell any police officer that he wished to have an attorney present before further questioning commenced. To the contrary, the Superior Court found that Flamer was advised of his *Miranda* rights, and he voluntarily, knowingly, and intelligently waived them. *State v. Flamer*, Del. Super., Cr.A. Nos. IK79–11–0236–R1, 0237–R1, 0238–R1, 0239–R1, Ridgely, J. (June 16, 1989) (Memorandum Opinion). In his statement, Flamer admitted that he had stabbed Byard Smith several times during the course of the theft from the Smith residence, but insisted that he had not killed Smith. He also disclosed the location of a second murder weapon.

The Public Defender's Office in Dover received Magistrate Cohee's order appointing the Public Defender as counsel on February 9, 1979. Flamer was interviewed by an investigator, and he gave his version of the murders and the circumstances surrounding his statement. Flamer's defense was assigned to Dennis Reardon, Esquire, a full-time Assistant Public Defender.

During the preliminary hearing on March 1, 1979, Reardon obtained substantial discovery of the State's case, following which he interviewed Flamer, potential witnesses on Flamer's behalf, and all of the State's witnesses. He inspected the crime scene. Reardon discussed the case at length with Dean Johnson, Esquire, counsel for codefendant Deputy. Although the office of the Public Defender had no written procedures manual on the defense of a capital murder charge, Reardon had previously defended a non-capital homicide case. He also discussed Flamer's case with other Assistant Public Defenders familiar with capital case procedures. Reardon did not check the court docket or records of Justice of the Peace Court No. 6 with regard to Flamer's initial appearance, nor did he recognize that Flamer had requested the appointment of counsel while at the Justice of the Peace Court.

Prior to trial, Reardon moved to suppress Flamer's statement on the grounds that Flamer was illegally detained and that the statement was involuntary. Officer Porter testified at the suppression hearing on October 30, 1979 that Flamer's statement following his appearance before the Justice of the Peace Court was made when Flamer initiated a conversation with Porter. Reardon's motion to suppress Flamer's statement was denied. Porter gave a different version of the events which occurred at Troop 5 when he testified at trial on January 30, 1989 that he had initiated the conversation with Flamer. Reardon did not renew the motion to suppress, although his

---

2. The trial testimony of Delaware State Police Officer William H. Porter on January 30, 1980 differed from earlier testimony given by Porter at the evidence suppression hearing with regard to who initiated the conversation between himself and Flamer on February 8, 1979. At trial, Porter indicated that he (Porter) had initiated the conversation with Flamer at Flamer's cell shortly after they had returned to Troop 5 after Flamer's appearance before the magistrate.

Porter had testified earlier that Flamer had initiated the conversation by stating, "Hey, I want to talk to you." Porter did not testify at Flamer's postconviction hearing on May 8, 1988. The Superior Court, in its denial of Flamer's motion for postconviction relief, ultimately found that it was Porter who had initiated the conversation. We adopt that court's factual finding regarding the statement.

continuing objection to the admission of the taped statement was noted at trial.

Upon the close of evidence at the guilt/innocence phase of the trial, the prosecutor gave a closing argument. Reardon waived his right to present a closing argument, although he had prepared one. The jury found Flamer guilty on February 7, 1980, and Reardon moved unsuccessfully for a judgment of acquittal. Prior to the commencement of the penalty phase of the trial, Reardon spoke with other attorneys in his office regarding how to handle the penalty phase proceeding. At that proceeding, the State presented the record of Flamer's two prior forgery convictions. Reardon presented Flamer, his mother, and his grandmother to testify with regard to mitigating factors. He also introduced two psychological and psychiatric reports about Flamer. On February 12, 1980, the jury unanimously recommended a sentence of death on each charge of murder in the first degree. Reardon filed a motion to vacate the penalties on evidentiary, statutory, and constitutional grounds, which was denied by Superior Court.

On appeal to this Court, Reardon and another Public Defender, Richard E. Fairbanks, Esquire, represented Flamer. They raised sixteen challenges to the verdicts and sentences which are addressed in this Court's opinion in *Flamer I*. This Court affirmed all convictions and sentences. Flamer then filed a motion for reargument,

which this Court denied. The United States Supreme Court denied Flamer's petition for *certiorari* on his guilt, *Flamer v. Delaware*, 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983); and on his sentence, 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985).

On June 5, 1986, with new counsel, Flamer filed a motion for postconviction relief pursuant to former Superior Court Criminal Rule 35(a),[3] in which he presented a series of complaints asserting ineffective assistance of counsel by his trial and appellate attorneys, as well as several contentions which had already been addressed and resolved against him on direct appeal.

The motion was denied by the Superior Court. Upon appeal of that decision to this Court, consideration of all the postconviction issues was consolidated in one proceeding, and the case was remanded to the Superior Court for a second postconviction hearing pursuant to the provisions of the present Superior Court Criminal Rule 61. *Flamer v. State*, Del.Supr., No. 216, 1987, Moore, J. (ORDER) (Feb. 19, 1988). Flamer, then represented by a third set of attorneys, filed a new petition for postconviction relief on April 11, 1988 which incorporated and expanded upon the claims raised in his June 1986 motion for postconviction relief. On April 27, 1988, Flamer amended his April 11 motion. After an evidentiary hearing, the Superior Court reserved decision and ordered briefing on the issues raised by Flamer's expanded April, 1988

---

**3.** Superior Court Criminal Rule 35(a) provided:
 (a) Postconviction Remedy. Any person who has been sentenced by the Court may apply by motion for postconviction relief for any meritorious claim challenging the judgment of conviction including claims: (i) That the conviction was obtained or sentence imposed in violation of the Constitution and laws of this State or the United States; (ii) that the Court imposing the sentence was without jurisdiction to do so; or (iii) that the sentence imposed exceeded the maximum authorized by law, or is otherwise not in accordance with the sentence authorized by law. An application may be filed at any time, provided, however, that postconviction relief shall (not be available so long as there is a possibility of taking a timely appeal from the judg-

ment of conviction). Unless the motion and the files and records of the case show to the satisfaction of the Court that the applicant is not entitled to relief, the Court shall cause notice thereof to be served on the Attorney General, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the Court finds the applicant is entitled to relief, the Court may set aside the judgment, release the applicant from custody, resentence the applicant, grant the applicant a new trial, or otherwise correct the judgment of conviction as may appear appropriate. The Court need not entertain a second motion or successive motions for similar relief on behalf of the same applicant.

motion. Both parties filed briefs and "[a]fter careful consideration of the evidence presented, the record in this case, and the arguments of counsel," the Superior Court denied Flamer's motion for postconviction relief by order dated June 16, 1989 (Superior Court Nos. IK79–11–0236–R1, 0237–R1, 0238–R1 and 0239–R1) (Ridgely, J.). We agree with the Superior Court and affirm its decision.

In this action Flamer asserts six contentions: 1) His taped statement taken while in custody the day after the murders was inappropriately admitted into evidence at trial in violation of both his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel; 2) A knife found as a result of the taped statement should not have been admitted into evidence at trial; 3) A bayonet found in his home following the murders was improperly admitted into evidence at trial in violation of his right to privacy; 4) The penalty phase jury instructions were inadequate and denied him due process of law; 5) The jury was instructed in unconstitutionally vague terms at the penalty phase of his trial in violation of his right to due process of law; 6) He is not barred from raising the previous five contentions, and his conviction should be overturned because he was denied effective assistance of counsel in both the trial and direct appeal of his case.

## I.

Because Flamer's present motion for postconviction relief is based in large part on contentions previously raised and on cases decided subsequent to his direct appeal, this Court must address the scope and purpose of postconviction relief as a matter of state law, as well as the retroactive applicability of the cases he cites to support his contentions.

█ We have recently addressed the scope of this State's postconviction relief remedy in the case of *Younger v. State,* Del.Supr., 580 A.2d 552 (1990). In the *Younger* case, we discussed the issue of finality with regard to postconviction relief. We now reiterate our position. Postconviction relief is a collateral remedy which provides an avenue for upsetting judgments that otherwise have become final. It is not designed as a substitute for direct appeal. It is a matter of fundamental import that there be a definitive end to the litigable aspect of the criminal process. *See, e.g., Mackey v. United States,* 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (separate opinion of Harlan, J.); *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) (Clark, J., dissenting). *See also* Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners,* 76 Harv. L.Rev. 441 (1963); Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U.Chi.L.Rev. 142, 146–151 (1970). Therefore, in *Younger* we held that we must apply the rules governing procedural requirements before giving consideration to the merits of underlying claims for postconviction relief. *Younger,* 580 A.2d at 554 (citing *Harris v. Reed,* 489 U.S. 255, 265, 109 S.Ct. 1038, 1044, 103 L.Ed.2d 308 (1989)).

█ Flamer's present contentions are barred by Superior Court Criminal Rule 61(i)(4)[4] because they all have been addressed previously and resolved on direct appeal. Under Rule 61(i)(4), any ground for relief which has already been an adjudicated is barred unless reconsideration of the claim is warranted in the interest of justice. *Hobbs v. State,* Del.Supr., 538 A.2d 723, 724–25 (1988); *Derrickson v. State,* Del.Supr., 406 A.2d 405, 407–08 (1979). As we noted in the *Younger* case, "[n]either federal nor state courts are required to relitigate in post conviction proceedings those claims which have been pre-

---

**4.** Superior Court Criminal Rule 61(i)(4) states:
 *Former Adjudication.* Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred, unless reconsid-

viously resolved." *Younger*, 580 A.2d at 556. In order to invoke the "interest of justice" provision of Rule 61(i)(4) to obtain relitigation of a previously resolved claim a movant must show that subsequent legal developments have revealed that the trial court lacked the authority to convict or punish him. *Cf. Davis v. United States*, 417 U.S. 333, 342, 94 S.Ct. 2298, 2303, 41 L.Ed.2d 109, 116–117 (1974). Because Flamer now bases several of his contentions on case law decided after his direct appeal, we must decide whether the United States Constitution compels us to reconsider our earlier decision based on these subsequent cases.

## II.

The first of Flamer's six contentions is that his taped statement, taken at the police station after his appearance before a magistrate, was improperly admitted into evidence. He also argues that the trial court should have suppressed a knife (a second murder weapon) that was discovered as a result of the statement. He further contends that his failure to raise these issues on direct appeal was the result of ineffective assistance of counsel.

## A.

■ Flamer contends that the statement was taken in violation of his Fifth Amendment right against self-incrimination. He bases his contention on the decision of the United States Supreme Court in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), which prohibits police-initiated interrogation after a defendant has asserted his right to counsel. Once a defendant invokes his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be inferred from the fact that the defendant responds to police-initiated questioning, even if he has been advised of his rights. The defendant cannot be subjected to further interrogation unless the accused himself initiates communication with police officers. *Id.* at 484–85, 101 S.Ct. at 1884–85,

68 L.Ed.2d at 386. The plain language of *Edwards* limits its application to situations in which an accused has invoked his right to have counsel present during a custodial interrogation. The rule of the *Edwards* case has recently been interpreted by the United States Supreme Court as including any police-initiated interrogation, even those conducted after the accused has consulted with counsel. *Minnick v. Mississippi*, —— U.S. ——, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). This Court has recognized that a request for counsel for specific purposes other than interrogation is not an invocation of the Fifth Amendment right to counsel contemplated in *Edwards*. *Brank v. State*, Del.Supr., 528 A.2d 1185, 1188 (1987).

Although the *Edwards* rule is not applicable retroactively, *Solem v. Stumes*, 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), it may be applicable to cases pending on appeal in state courts at the time of the *Edwards* decision. *Shea v. Louisiana*, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985). Because *Edwards* was decided while Flamer's direct appeal was pending, it may be applicable to Flamer's case.

Flamer contends that he invoked his right to counsel several times during custodial interrogation. He further contends that his request for appointment of counsel at his initial appearance before a magistrate precluded further interrogation without his counsel being present. We note that Flamer, at the original suppression hearing and during the later Rule 35 and Rule 61 postconviction hearings, testified that he had several times made requests to the police for an attorney after they had given him *Miranda* warnings. Nevertheless, this Court found on direct appeal that Flamer never invoked his *Miranda* right to counsel during custodial interrogation. *See Flamer I*, 490 A.2d at 114, "[a]lthough defendant did not request counsel at any stage of his interrogation ..." and "[there is no] contention that defendant from the

eration of the claim is warranted in the interest of justice.

moment of arrest until contact was made with him through the Public Defender's Office, ever attempted to invoke any of the *Miranda* rights." In the postconviction process, the Superior Court has also found, after an evidentiary hearing and subsequent briefing, that "Flamer was advised of his *Miranda* rights on several occasions during the period and, on each occasion, he indicated a willingness to speak to the police without an attorney being present." *State v. Flamer*, Del.Super., IK79–11–0236–RI, et al., Ridgely, J. (June 16, 1989), slip. op. at 5. We adhere to these findings of fact, so we address only the issue of whether *Edwards* should be extended, under the Fifth Amendment, to preclude police-initiated interrogation after counsel has been requested or appointed at an initial appearance before a magistrate.

■ Because Flamer's motion for postconviction relief is controlled by Superior Court Criminal Rule 61, we must first apply the rules governing procedural requirements before giving consideration to the merits of the underlying claim. *Younger*, 580 A.2d at 554, *citing Harris v. Reed*, 489 U.S. 255, 265, 109 S.Ct. 1038, 1044, 103 L.Ed.2d 308 (1989). Flamer did not present an *Edwards* argument on direct appeal. However, he had the opportunity to raise such a claim at the time of appeal since *Edwards* was decided almost two years before this Court issued an opinion in Flamer's direct appeal.[5] *Edwards* was known, or should have been known, to Flamer's counsel before 1983. Under the circumstances, in order for Flamer to raise the issue for the first time in his present petition for postconviction relief, he is required to show "cause" for relief from his

failure to present the issue on direct appeal and "actual prejudice" resulting from the alleged error. Super.Ct.Crim.R. 61(i)(3);[6] *Johnson v. State*, Del.Supr., 460 A.2d 539 (1983); *Conyers v. State*, Del.Supr., 422 A.2d 345 (1980).

■ Flamer contends that one of the attorneys assisting in his direct appeal, Richard E. Fairbanks, Jr., did not know that there had been an invocation of counsel by Flamer at his initial appearance before Magistrate Cohee on February 8, 1979. Fairbanks testified at the postconviction relief hearing that he felt he needed such an invocation to argue an *Edwards* claim on appeal. But the fact that Magistrate Cohee had appointed a lawyer for Flamer on February 8, 1979 was known at the time of direct appeal. Flamer presumably knew between 1981 and 1984 (just as he did in 1988 when he testified at the second postconviction relief hearing) that he had requested counsel at the Justice of the Peace Court. The Justice of the Peace Court records state "The defendant ... requests appointment of counsel." These records were available at the time of direct appeal. Counsel had these pieces of information available to construct a legal challenge on direct appeal. Therefore, the "mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 486–87, 106 S.Ct. 2639, 2644, 91 L.Ed.2d 397, 407 (1986). Given the fact that this information was available in 1981, we rule that Flamer has failed to show cause for relief from his failure to raise the *Edwards* claim on direct appeal.

■ Since we have ruled that Flamer has not shown cause for relief from the

---

5. *Edwards* was decided by the U.S. Supreme Court on May 18, 1981. The Delaware Supreme Court issued opinions in Flamer's direct appeal on February 7, 1983 (guilt phase) and September 20, 1984 (penalty phase). This Court issued the final mandate on Flamer's direct appeal on February 25, 1985, following denial of a motion for reargument.

6. Superior Court Criminal Rule 61(i)(3) states:

*Procedural Default.* Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this Court, is thereafter barred, unless the movant shows

(A) cause for relief from the procedural default and

(B) prejudice from violation of the movant's rights.

claimed procedural default, it is not necessary to consider whether Flamer can demonstrate prejudice from the supposed violation. We note, however, that Flamer also has not established the element of prejudice necessary for us to overturn his conviction. To succeed under the element of prejudice, Flamer must show that there was a "substantial likelihood" that, if he had pressed the extended *Edwards* claim during his appeal, the outcome of his case would have been different. *United States v. Frady*, 456 U.S. 152, 172–74, 102 S.Ct. 1584, 1596–97, 71 L.Ed.2d 816, 833–834 (1982); *Johnson*, 460 A.2d at 541. In fulfilling that burden, Flamer cannot merely show an error of constitutional dimension and then shift to the prosecution the burden of showing that the error was harmless. *State v. Conyers*, Del.Super., 413 A.2d 1264, 1266 (1979), *aff'd*, Del.Supr., 422 A.2d 345 (1980) (*per curiam*). Rather, he must demonstrate that if he had asserted the challenge, "he might not have been convicted." *Reed v. Ross*, 468 U.S. 1, 12, 104 S.Ct. 2901, 2908, 82 L.Ed.2d 1 (1984).

In determining prejudice, it is necessary to focus on the existing law at the time Flamer's convictions became final in 1983 and not on the law as it evolved through subsequent developments. *See Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), *reh'g denied*, 490 U.S. 1031, 109 S.Ct. 1771, 104 L.Ed.2d 206 (1989). In this case, we find that Flamer cannot establish the required prejudice. Flamer has not shown that at the time his convictions became final in 1985, an *Edwards* claim such as he now raises would have been successful and changed the outcome of his case. A finding that his request for counsel at his initial appearance was indeed an invocation of protection from self-incrimination under the *Miranda* case would have run counter to the prevailing law in many jurisdictions, including this State. *See Brank*, 528 A.2d at 1188; *Jordan v. Watkins*, 681 F.2d 1067, 1073 (5th Cir.1982), *reh'g denied, Jordan v. Thigpen*, 688 F.2d 395 (5th Cir.1982). *See also Col-*lins *v. Francis*, 728 F.2d 1322, 1331–32 (11th Cir.1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984); *State v. Rodriguez*, 145 Ariz. 157, 700 P.2d 855, 873 (App.1984); *Berry v. State*, 254 Ga. 101, 326 S.E.2d 748, 751 (1985), *aff'd after remand*, 255 Ga. 466, 339 S.E.2d 711 (1986); *Ross v. State*, 254 Ga. 22, 326 S.E.2d 194, 198–99, *cert. denied*, 472 U.S. 1022, 105 S.Ct. 3490, 87 L.Ed.2d 623 (1985); *White v. State*, 168 Ga.App. 794, 310 S.E.2d 540, 542 (1983); *State v. Jackson*, 60 Or. App. 681, 655 P.2d 592, 596 (1982) review denied, 296 Or. 486, 677 P.2d 702 (1984); *Tomlin v. State*, Tex.Ct.App., 690 S.W.2d 5, 8 (1984) *aff'd en banc*, Tex.Cr.App., 722 S.W.2d 702 (1987). Since Flamer can demonstrate neither the requisite cause nor that actual prejudice resulted from his claimed procedural defects in the appeal of his convictions, we find that his contentions are barred pursuant to the provisions of Superior Court Criminal Rule 61(i)(3).

### B.

Flamer also challenges the admission of his taped statement on the ground that his Sixth Amendment right to counsel was violated under the rule set out by the United States Supreme Court in *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), a case which was decided three years after Flamer's convictions and two years after Flamer's sentences were affirmed by this Court on direct appeal. This Court ruled on direct appeal that Flamer's taped statement had not been elicited from him in violation of his Sixth Amendment guarantee of the right to counsel. *Flamer I*, 490 A.2d at 112–15. In *Jackson*, the Court held that if the police initiate conversation with a defendant after he has asserted his right to counsel at arraignment, any waiver of the right to counsel is invalid.

We now analyze Flamer's contention under a new approach recently articulated by the United States Supreme Court with regard to federal *habeas corpus* relief. For cases on collateral review, a plurality of the Supreme Court developed a retroactivity

analysis in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), *reh'g denied*, 490 U.S. 1031, 109 S.Ct. 1771, 104 L.Ed.2d 206 (1989). The analysis applies to both capital and non-capital cases. *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

In *Teague*, the Court held that the question of whether subsequent rulings should be available to overturn prior convictions is "not so much one of prospectivity or retroactivity of the rule, but rather of the availability of collateral attack ... to go behind the otherwise final judgment of conviction...." *Teague*, 489 U.S. at 309, 109 S.Ct. at 1074, 103 L.Ed.2d at 355 (quoting Mishkin, *Foreword: the High Court, the Great Writ, and the Due Process of Time and Law*, 79 Harv.L.Rev. 56, 77 (1965)). The Court, in adopting Justice Harlan's separate dissenting opinion from *Mackey v. United States*, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971), stated, "it is 'sounder, in adjudicating habeas petitions, generally to apply the law prevailing at the time a conviction became final than it is to seek to dispose of [habeas] cases on the basis of intervening changes in constitutional interpretation.'" *Teague*, 489 U.S. at 306, 109 S.Ct. at 1073, 103 L.Ed.2d at 353 (quoting *Mackey*, 401 U.S. at 689, 91 S.Ct. at 1178, 28 L.Ed.2d at 418 (separate opinion of Harlan, J.)).

Based on this standard, we adopt a general rule of non-retroactivity for cases on collateral review. A postconviction relief court need apply only the constitutional standards that prevailed at the time the original proceedings took place. The application of a constitutional rule not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect. *See Teague*, 489 U.S. at 288, 109 S.Ct. at 1074, 103 L.Ed.2d at 355. Therefore, we hold that new constitutional rules of criminal procedure will *not* be applicable to those cases which have become final before the new rules are announced, unless the rules fall within one of two exceptions.

A case announces a "new rule" when it breaks new ground or imposes a new obligation on the states or federal government or if the result was not *dictated* by precedent existing at the time a defendant's conviction became final. *Penry*, 492 U.S. at ——, 109 S.Ct. at 2944, 106 L.Ed.2d at 274 (citing *Teague*, 489 U.S. at 288, 109 S.Ct. at 1070, 103 L.Ed.2d at 349) (emphasis in original). The general rule of non-retroactivity applies only to new rules and not to cases announcing rules which are merely an application of the principle that governs a prior case decided before a defendant's trial took place. See *Younger*, 580 A.2d at 554 (holding that the decision in *Weber v. State*, Del.Supr., 547 A.2d 948 (1988) is merely an application of the principle set forth in *Burton v. State*, Del.Supr., 426 A.2d 829 (1981)).

Since Flamer's conviction became final in 1985, the rule in *Michigan v. Jackson* is not applicable to Flamer's case unless it falls within one of the two exceptions to the general rule of non-retroactivity. Under the first exception, "a new rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe.'" *Teague*, 489 U.S. at 311, 109 S.Ct. at 1075, 103 L.Ed.2d at 356 (quoting *Mackey*, 401 U.S. at 692, 91 S.Ct. at 1180, 28 L.Ed.2d at 420 (separate opinion of Harlan, J.)). Under the second exception, a rule may apply retroactively if it "requires the observance of 'those procedures that ... are implicit in the concept of ordered liberty.'" 489 U.S. at 313, 109 S.Ct. at 1075, 103 L.Ed.2d at 356 (quoting *Mackey*, 401 U.S. at 693, 91 S.Ct. at 1180, 28 L.Ed.2d at 421 (separate opinion of Harlan, J.) (internal citations omitted). The *Teague* plurality proposed a modification of this exception, restricting it "to those new procedures without which the likelihood of an accurate conviction is seriously diminished." 489 U.S. at 313, 109 S.Ct. at 1076–77, 103 L.Ed.2d at 358.[7]

---

7. The Court of Appeals for the Eleventh Circuit has noted

The Court of Appeals for the Eleventh Circuit has concluded that the rule announced in *Michigan v. Jackson* undoubtedly constitutes a new rule. *Collins v. Zant*, 892 F.2d 1502, 1511 (11th Cir.1990). In *Jackson*, the United States Supreme Court "imposed a new obligation on police (not to initiate an interrogation after a defendant has asserted his right to counsel under the sixth amendment) and established a bright line rule excluding police-initiated statements (a result not dictated by then existing precedent)." *Collins*, 892 F.2d at 1512. Moreover, the rule in *Jackson* falls under neither of the two available exceptions. *Id.* Because the rule in *Jackson* has no retroactive application to Flamer's case, we conclude that reconsideration of his claim is not warranted in the interest of justice. His contention is rejected pursuant to Superior Court Criminal Rule 61(i)(4).

Since Flamer's taped statement to police at Troop 5 was properly admitted into evidence at trial, it was also proper to admit into evidence the second murder weapon found as a result of the statement.

### III.

This Court has also fully addressed and resolved on direct appeal three of the other contentions Flamer now raises in his appeal from the Superior Court's denial of his motion for post-conviction relief. Flamer contends that it was error to admit a bayonet, which was seized at his grandmother's house, into evidence, based on *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), a case decided four years after we affirmed Flamer's convictions and three years after we affirmed Flamer's sentences. Flamer next contends that at the penalty phase of the trial, defense counsel should have requested certain jury instructions, and the Superior Court should have given these instructions to the jury. Flamer argues that he was denied due process of law as a result of these omitted instructions. Finally, Flamer contends that the jury's consideration of an improper aggravating circumstance at the penalty phase of the trial denied him due process of law under a "balancing" type of death penalty statute.

### A.

Flamer relies on *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), to contend that it was plain error to admit a bayonet found at his grandmother's home into evidence at his trial because the unsheathing of the knife by the police constituted an impermissible search in violation of the Fourth Amendment. On direct appeal, Flamer also challenged the admission of the bayonet into evidence. In *Flamer I*, this Court addressed the admissibility of the bayonet and held that it was in plain view to the police during consensual entry into Flamer's grandmother's house. *Flamer I*, 490 A.2d at 116–117. Flamer's postconviction contention raises no new grounds for relief, and it is barred under Superior Court Criminal Rule 61(i)(4). Flamer based his contention during direct appeal on *Bumper v.*

[i]n *Teague*, Chief Justice Rehnquist and Justices Scalia and Kennedy joined Justice O'Connor's opinion, which adopted Justice Harlan's approach to retroactivity, but proposed a modification of Justice Harlan's second exception. Justices Stevens and Blackmum concurred in the plurality's adoption of Justice Harlan's approach, but they explicitly rejected the plurality's proposed modification of his second exception, especially in the context of capital cases. Justice White concurred only in the result reached by the plurality, which he described as "an acceptable application in collateral proceedings of the theories embraced by the Court in cases dealing with direct review" (such as *United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), *Shea v. Louisiana*, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985), and *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)). Those direct review cases, however, did not address the specifics of Justice Harlan's exceptions to the rule of nonretroactivity. We cannot, therefore, read Justice White's concurrence as an endorsement of the plurality's adoption of Justice Harlan's general approach and certainly not as an endorsement of the proposed modification of Harlan's second exception.

Thus, six Justices concur in the general application of Justice Harlan's retroactivity analysis, but only four members of the Court support a restriction of Harlan's second exception.

*Collins v. Zant*, 892 F.2d 1502, 1511, n. 10 (11th Cir.1990) (citations omitted).

*North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), claiming that the State offered no proof that his grandmother's consent to admit the police officers into the residence was anything more than an unknowing, unintelligent acquiescence resulting from the sudden confrontation by police officers looking for her grandson. Flamer now relies on *Hicks*, which merely provides a different legal predicate for the same claim that the seizure of the bayonet was improper. *Hicks* states that probable cause is required to invoke the "plain view doctrine" as it applies to seizures. *Hicks* was decided two years after Flamer's direct appeal became final. In order to obtain the benefit, if any, of the ruling in *Hicks*, Flamer must establish that the decision in *Hicks* did not create a new rule. *Saffle v. Parks*, 494 U.S. ——, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). He has not made this showing, but merely argues that "[t]he seizure of the bayonet was unlawful since none of the three prerequisites for a valid plain view seizure were met. *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 349 [347] (1987)." We see no reason to apply *Hicks* retroactively to Flamer.

■■■ Even if we were to apply *Hicks*, however, the circumstances of the murders and the context in which the sheathed bayonet was found gave the police probable cause to seize it. Although the blood on the blade was not visible until the knife was removed from its scabbard, the sheathed bayonet was in plain view. The officer who participated in the search testified that he had observed a dark, thick substance on the scabbard. Further, he testified that the bayonet could not be characterized as an ornamental object, but as a military-type weapon. The bayonet was properly seized because there was a valid entry into the home to search for Flamer and an incidental finding of the weapon. In view of the nature of the homicides, the evidentiary value of what was seized was immediately apparent. *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564, *reh'g denied*, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971); *United States v. Woods*, 560 F.2d 660, 664 (5th Cir.1977); *Commonwealth v. Lassiter*, 457 Pa. 582, 321 A.2d 902, 905 (1974); *Giles v. United States*, D.C.App., 432 A.2d 739, 741 (1981). We conclude that neither justice nor the need to insure compliance with the Fourth Amendment requires reconsideration of Flamer's challenge to the admissibility of the bayonet.

### B.

Flamer next asserts that the penalty phase jury instructions were defective and inadequate. Flamer contends:

> ... the jury should have been instructed by the Superior Court and defense counsel should have requested the following instructions: (1) informing the jury how to weigh mitigating and aggravating factors; (2) the prosecution's burden of proof at the penalty hearing; (3) whether the Delaware death penalty statute, 11 *Del.C.* § 4209, is a threshold or balancing type of statute; (4) that the jury must employ a two step analysis by first finding the existence of one or more aggravators and then weighing the evidence of aggravation against all mitigating evidence present in the case; (5) the role of mitigating evidence in the jury's decision whether or not to impose a death sentence; and (6) that under any circumstances, the jury was not required to impose a sentence of death regardless of the existence of one or more statutory aggravating circumstances.

This Court stated on direct appeal:

> [w]e [have] carefully scrutinized the six and one-half pages of jury instructions in the transcript and conclude that the jury charge constituted a correct statement of the substance of the law of sentencing in First Degree Murder cases and was not so deficient that it rises to the level of reversible error.

*Flamer I*, 490 A.2d at 128. Flamer, without citing any authority, now contends that he was denied due process of law as a result of various "omissions" in the jury instructions. He does not argue, however, that the trial court's charge was so deficient that, when viewed *in toto*, there was

a reasonable probability that the jurors misunderstood their role in the capital sentencing procedure or the meaning and function of mitigating circumstances. *See, e.g., Peek v. Kemp,* 784 F.2d 1479, 1485–95 (11th Cir.1986) *(en banc), cert. denied,* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986); *Briley v. Bass,* 750 F.2d 1238, 1242–45 (4th Cir.1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985); *Williams v. Kemp,* 846 F.2d 1276, 1284–85 (11th Cir.1988), *cert. dismissed,* 489 U.S. 1094, 109 S.Ct. 1579, 103 L.Ed.2d 931 (1989). After further careful review of the trial court's penalty phase jury instructions, we continue to find Flamer's assertions of error to be without merit. The instructions at Flamer's penalty phase hearing were far more extensive than those in the later case of *Whalen v. State,* Del. Supr., 492 A.2d 552 (1985), where this Court found the instructions to have been inadequate to guide the jury's discretion. *Id.* at 561.[8] *Whalen* directs

> ... it is the trial judge's duty to guide the jury's discretion by ensuring that [the members] understand the bases for imposing a death sentence, and comprehend their responsibilities in applying such criteria.

*Id.* at 559.

Specifically in regard to penalty phase jury instructions,

> ... jury instructions must clearly convey the point that whenever an aggravating circumstance is found, this two-part analysis still permits the jury to recommend against the death penalty no mat-

ter what aggravating circumstances are found.

*Id.* at 560.

 These directions require the judge at a penalty phase hearing following a guilty verdict in a capital crime case to charge the jury that all evidence of both aggravating and mitigating circumstances which has been properly presented must be considered when deciding between imposition of a death penalty or life imprisonment without opportunity of probation or parole. This requirement conforms to recent United States Supreme Court guidance on capital sentencing, "[T]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence." *Blystone v. Pennsylvania,* ── U.S. ──, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990). The instructions provided at Flamer's trial were consistent with *Whalen*'s direction. The judge at Flamer's penalty phase hearing opened his instructions by admonishing jurors that, in making their decision as to the sentence to be imposed,

> No single one of these instructions states all of the law applicable to this determination. Therefore, you should listen to and consider all the instructions together.

Transcript at 632.

The trial judge then noted three times that 11 *Del.C.* § 4209(d)[9] requires a unanimous two-step decision before any imposition of the death penalty: a) a finding of at least one statutorily defined aggregating circumstance, followed by b) a finding that

---

8. *Whalen v. State,* Del.Supr., 492 A.2d 552 (1985), was decided two years after Flamer's direct appeal. *Whalen* merely elaborated on existing law regarding penalty phase jury instructions in capital cases. We view the jury charge in the case at bar as adequate under standards existing at the time of Flamer's trial and as elaborated in *Whalen.* For a more complete discussion of the inadequacies of *Whalen's* jury instructions, see *Riley v. State,* Del.Supr., 585 A.2d 719 (1990), an opinion which is being released simultaneously with this opinion.

9. 11 *Del.C.* § 4209(d) states:
*Determination of sentence.*—(1) A sentence of death shall not be imposed unless the jury or judge, where appropriate, finds:

> a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and
> b. Unanimously recommends, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed. Where the jury, or judge when applicable, submits such a finding and recommendation, the Court shall sentence the defendant to death as provided by subsection (f) of this section. A finding by the Jury of a statutory aggravating circumstance, and a consequent recommendation of death, supported by the evidence, shall be binding on the Court.

all relevant aggravating circumstances sufficiently outweigh all relevant mitigating circumstances to warrant imposition of the death penalty. The trial judge adequately informed jurors of their options in sentencing Flamer by stating three times in his instructions that a failure to agree unanimously either at the first step (on the existence of at least one statutorily defined aggravating circumstance) or at the second step (on the appropriateness of the death penalty in light of all aggravating and mitigating circumstances) would result in the imposition on Flamer of a life sentence without opportunity for probation or parole. The court defined aggravating and mitigating circumstances for the jury and appropriately instructed the jury that Flamer's conviction of felony murder under 11 *Del.C.* § 636(a)(2) for murder during commission of a robbery constituted one statutorily defined aggravating circumstance sufficient to meet the first step required in the decision process for imposition of a death sentence.

The trial court provided to the jury a set of four interrogatories, one for each of the four counts of murder in the first degree. These interrogatories reinforced the court's instruction that imposition of the death sentence required a unanimous two step process. Each interrogatory included the two-step consideration required by 11 *Del.C.* § 4209(d). Each asked if one or more statutorily defined aggravating circumstance was found to exist and each then asked if the jury found the death penalty to be appropriate. We conclude that the trial court's instructions adequately apprised the jury members of their duties, responsibilities and options for imposing sentence on Flamer.

### C.

■■■ Flamer next contends that the jury's penalty phase consideration of an improper statutory aggravating circumstance is a denial of due process of law under a balancing type death penalty statute. This Court, on direct appeal, concluded that "the statutory aggravating circumstance complained of here, i.e., 'The murder was outrageously or wantonly vile, horrible

or inhuman' was unconstitutionally vague. *State v. Chaplin*, Del.Super., 433 A.2d 327, *aff'd*, [Del.Supr.], 433 A.2d 325 (1981);" *Flamer I*, 490 A.2d at 131. This Court also concluded that Delaware's death penalty statute is a "threshold" rather than a balancing type of statute, and, therefore, the jury's consideration of the vague statutory aggravating circumstance was harmless error. *Flamer I*, 490 A.2d at 136.

We find that Flamer has failed to assert any reason in the interest of justice which requires further consideration of the penalty phase jury instructions. Super.Ct.Cr.R. 61(i)(4).

### IV.

■■■ Finally, Flamer raises claims of ineffective assistance of counsel at trial and on direct appeal. Such claims are appropriate in motions for postconviction relief, *Du-Ross v. State*, Del.Supr., 494 A.2d 1265, 1267–68 (1985), because they argue that counsel's defaults precluded the prior proceedings from being a fair resolution of guilt in accord with then applicable legal principles. *Kimmelman v. Morrison*, 477 U.S. 365, 373–80, 106 S.Ct. 2574, 2580–86, 91 L.Ed.2d 305, 318–323 (1986).

■■■ Flamer's ineffective assistance of counsel contention must be evaluated pursuant to the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh'g denied*, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). In order to succeed on such a contention, Flamer "must show that counsel's representation fell below an objective standard of reasonableness," and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Albury v. State*, Del.Supr., 551 A.2d 53, 58 (1988) (citing *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. at 2065, 2068, 80 L.Ed.2d at 693, 697). Also, as noted earlier, review of counsel's representation is subject to a strong presumption that the representation was professionally reasonable. *Albury*, 551 A.2d at 59; *Strickland*,

466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. *"Strickland's* standard, although by no means insurmountable, is highly demanding." *Kimmelman,* 477 U.S. at 382, 106 S.Ct. at 2586, 91 L.Ed.2d at 323. Moreover, because the Superior Court has had the opportunity to hear the evidence, evaluate the credibility of the witnesses, and review the transcripts of the prior proceedings, this Court will not upset its findings unless an abuse of discretion is evident. *Albury,* 551 A.2d at 60.

At the evidentiary hearing in Superior Court on Flamer's motion for postconviction relief, an expert witness, Thomas J. Saunders, the District Public Defender for Baltimore County, Maryland, appeared on behalf of Flamer. He testified on the federal constitutional minimum standards for effective assistance of counsel as set forth in *Strickland.* Although the State moved to strike Saunders' testimony, the Superior Court denied the State's motion, concluding that "[t]he Court may reject an expert's opinion if it finds the facts to be different from those which formed the basis of the opinion, or if, after careful consideration of all the evidence in the case—expert and other—the Court disagrees with the opinion." *State v. Bailey,* Del.Super., 519 A.2d 132, 138 (1986). The Superior Court declined to treat Saunders' testimony as conclusive and, after conducting its own independent analysis of Flamer's contention, found no merit in his assertion of ineffective assistance of counsel. After hearing oral argument and carefully examining the record pursuant to the above-mentioned standards, we also find Flamer's contentions to be without merit and affirm the decision of the Superior Court.

Flamer's contentions regarding ineffective assistance of counsel extend to all three phases of his prior proceedings: 1) the guilt/innocence phase of trial, 2) the penalty phase of trial, and 3) direct appeal.

### A.

Flamer contends that the deficiencies in his defense at the guilt/innocence phase of the trial include:

1) omission of a closing argument;

2) abandoning or failing to make objections to the admission of the television and bayonet into evidence;

3) advising Flamer to testify during trial;

4) improper cross-examination of the medical examiner with regard to the autopsy reports;

5) not pursuing a unified theory of defense; and

6) failing to renew a motion to suppress evidence after the change in Officer Porter's testimony with regard to initiation of the conversation which resulted in Flamer's taped statement.

Flamer was represented throughout his trial by Dennis Reardon, a Public Defender with many years of experience in handling criminal cases. The State was represented by Dana Reed, a Kent County prosecutor.

■ Flamer's argument focuses primarily on his counsel's failure to present a closing statement to the jury. Flamer contends that by failing to give a closing argument, Reardon totally abdicated the role of counsel. *See Gardiner v. United States,* 679 F.Supp. 1143, 1146 (D.Me.1988). At the close of the guilt/innocence phase of the trial, Reardon waived the right to present a closing argument to the jury. The State argues that such a decision was a strategic choice which counsel made to deprive the prosecutor of a rebuttal argument and thus, not subject the jury to the "sandbagging" technique that Reardon anticipated would be utilized by the prosecution.

■ The Superior Court found that Kent County prosecutors at the time of Flamer's trial were said to be routinely holding back their major arguments in summation until after the defense had given its closing argument to the jury. The Superior Court further found that Reardon's choice to omit a closing argument was made after Reardon assessed the prosecution's opening argument as having little impact on the jury. When this assessment and the waiver of closing argument are viewed in light of the "sandbagging" practice said to be utilized during rebuttal by Kent County prosecutors, such a waiver was within the wide range of reasonable

professional assistance. The fact that the tactic of "sandbagging" was ultimately the basis for a reversal of a conviction by this Court two years later in *Bailey v. State*, Del.Supr., 440 A.2d 997 (1982), does not render Reardon's performance deficient at the time of Flamer's trial. As noted in *Strickland*, a reviewing court must examine an attorney's performance as viewed at the time of counsel's conduct. 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 674.

We reiterate and affirm the findings of the Superior Court with regard to Flamer's remaining alleged deficiencies in counsel's performance. Flamer contends that Reardon's performance was deficient because he did not pursue a proper suppression motion with respect to the seizure and subsequent admission into evidence of the bayonet (one of the murder weapons) and the television, which was stolen from the Smith residence. Reardon did move to suppress the bayonet and participated in a hearing which focused, in part, on its admissibility. As we discussed earlier, it was neither unreasonable nor prejudicial for Reardon to have foregone the argument with regard to the unsheathing of the bayonet in light of the law existing at the time of trial and in light of our finding that there was indeed sufficient justification to seize the bayonet. Reardon was also under no obligation to continue to seek suppression of the television since it was identifiable by witnesses and the presence of an incorrect evidence tag on it merely influenced its weight as evidence and not its admissibility.

Flamer next argues that Reardon should not have advised him to testify at trial. There is no evidence that Flamer was coerced or tricked into testifying. It was not unreasonable to call Flamer to the stand, even though the testimony left little doubt that the evidence warranted a conclusion contrary to that sought by the defendant. *See United States v. Brackenridge*, 590 F.2d 810, 811 (9th Cir.), *cert. denied*, 440 U.S. 985, 99 S.Ct. 1801, 60 L.Ed.2d 248 (1979). A reasonably competent attorney, acting as a conscientious advocate, can properly feel that the jury should hear the defendant's version of the incident. *Id.* Once Flamer had testified to a different set of events than he had divulged previously to his attorney, it was too late to alter the decision to testify.

In order for Flamer to succeed on an ineffective assistance of counsel claim, he must demonstrate that there is a reasonable probability that, but for counsel's errors, he would not have chosen to testify, and the result of the trial would have been different. *See Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 370–71, 88 L.Ed.2d 203, 210 (1985). Flamer has not made this showing. Unless the jury chose to discredit his taped statement, in which he confessed to the crime, Flamer stood little chance of acquittal. *See Thompson v. Scurr*, 668 F.2d 999, 1003 (8th Cir.1982); *United States v. Medina–Verdugo*, 637 F.2d 649, 653 (9th Cir.1980). We are not persuaded that Reardon's advice caused a different outcome than otherwise would have been reached at trial.

Flamer also contends that Reardon was deficient because he failed to conduct a "proper" cross-examination of the Medical Examiner with regard to the possible existence of a third murder weapon and the assertion by Flamer that he merely stabbed his uncle, but did not kill him. Flamer is asking this Court to speculate that the responses from the Medical Examiner, had he been questioned as to these assertions, would have been beneficial to Flamer's defense. Since there is no evidence as to what the witness's answers would have been, this Court will not speculate as to those answers. *See Aldrich v. Wainwright*, 777 F.2d 630, 636–37 (11th Cir. 1985), *cert. denied*, 479 U.S. 918, 107 S.Ct. 324, 93 L.Ed.2d 297 (1986). Accordingly, we find no prejudice to Flamer in Reardon's failure to cross-examine the Medical Examiner regarding a possible third weapon.

Flamer next contends that Reardon did not pursue a unified-defense theory. We adopt the finding of the Superior Court which concluded that Flamer's claim is contradicted by the evidence. Reardon's strategy was to raise doubt in the State's case against Flamer by asserting that Deputy,

rather than Flamer, was responsible for the homicides. Again, Reardon's performance was within the wide range of reasonable professional assistance. *See United States v. Curry,* 663 F.2d 572, 574 (5th Cir.1981).

 Finally, Flamer claims that, based on *Edwards v. Arizona,* Reardon should have renewed his motion to suppress physical evidence and Flamer's statement to the police when Officer Porter gave testimony at trial inconsistent with that which he had given at the evidence suppression hearing. Prior to trial, the court considered Flamer's motion to suppress physical evidence and his statements to the police. The motion was denied, with the exception that a fan and certain frozen foods were suppressed. Reardon noted that his objection was a continuing one, and he also reiterated his objection to the statements during the trial. *Edwards,* on which Flamer argues Reardon should have relied, was not decided until one year after Flamer's trial. Under the law existing at the time of Flamer's trial, the change in Porter's testimony had minimal relevance. Accordingly, Reardon's performance at trial was not deficient and, for the reasons discussed at length earlier, no prejudice has been shown.

### B.

Flamer's argument that his counsel's assistance was deficient at the penalty phase of the trial focuses on the following contentions:

1) failure to investigate and present additional mitigating evidence;
2) failure to give longer, more detailed opening and closing arguments to the jury; and
3) failure to request more detailed jury instructions.

 Flamer contends that Reardon's assistance was deficient because he did not present all possible mitigating evidence at the penalty phase of the trial. At the penalty hearing, Reardon focused on seven mitigating factors: (1) Flamer's history of alcohol abuse and his intoxication at the time of the offense; (2) Flamer's difficult and often unstructured lifestyle; (3) Flam-

er's low intelligence; (4) Flamer's relationship with his family, particularly the assistance he often provided his elderly grandmother; (5) Flamer's actions were not the sole cause of the deaths; (6) Deputy shared equal, if not greater blame, for the homicides; and (7) that the alternative punishment, life imprisonment without probation or parole, was in itself, an appropriate sanction. Flamer argues that evidence of remorse from a number of sources should have been introduced, that the violent nature of his codefendant, Andre Deputy, should have been emphasized, and that additional witnesses, particularly one or more of the psychiatric/psychological experts who prepared evaluations of Flamer, should have been called to testify.

 Flamer, however, did not present any of this new mitigating evidence at either of his postconviction hearings. The "mere fact that other witnesses might have been available ... is not sufficient ground to prove ineffectiveness of counsel." *Cape v. Francis,* 741 F.2d 1287, 1301 (11th Cir.1984), *cert. denied,* 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 245 (1985). We will not speculate on what testimony these other witnesses might have presented. Therefore, Flamer's argument depends on how the mitigating circumstances were presented or on other possible cumulative evidence about those mitigating circumstances. While there is a general duty on defense counsel to investigate potentially mitigating evidence for use at the penalty stage, there is no absolute duty to present all potentially mitigating evidence. *Stanley v. Zant,* 697 F.2d 955, 961 (11th Cir. 1983), *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984). Indeed, there is no duty for defense counsel to pursue all lines of investigation about potentially mitigating evidence. Counsel can make reasonable choices about what factors stand the best chance to convince the jury not to impose death and focus his investigation on uncovering evidence related to those particular factors. *Burger v. Kemp,* 483 U.S. 776, 794–95, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638, 657 (1987). Even then, he need not present all the evidence he may

have uncovered. The decision about what evidence to present remains with defense counsel and in a given case counsel may, quite reasonably, refrain from presenting evidence. *Burger*, 483 U.S. at 790–91, 107 S.Ct. at 3124, 97 L.Ed.2d at 654–655; *Stanley*, 697 F.2d at 961. To be reasonably competent, an attorney need not present cumulative evidence, nor must he present every witness who can offer mitigating testimony. *Stanley*, 697 F.2d at 965. *See also Mitchell v. Kemp*, 762 F.2d 886, 889–90 (11th Cir.1985). The manner in which Saunders states he would have defended Flamer was not the only way for competent trial to counsel to have proceeded. We find Reardon's conduct regarding presentation of mitigating circumstances to be within the wide range of reasonable assistance which the Sixth Amendment guarantees.

■ Flamer next alleges that Reardon's opening argument was deficient because he omitted several mitigating circumstances, made confusing statements regarding the evidence of alcoholism, and did not discuss the weighing process the jury was to utilize in balancing the mitigating and the aggravating circumstances. Flamer also contends that Reardon did not mention several mitigating circumstances or the appropriate weighing process in his closing argument to the jury. We note that Reardon's opening and closing arguments were, indeed, brief. We also note, however, that in his opening argument, Reardon did inform the jury members of the importance of their duty to choose between life and death and that if they chose the alternative of life, it would mean a lifetime of imprisonment without any possibility of probation or parole. He also alerted the jury to the importance of two psychological reports that would be offered, and he emphasized that from the reports the jury would see how Flamer, with his low intelligence and alcohol addiction, could be manipulated by Andre Deputy, the other person accused of the killings.

■ During testimony at the postconviction hearing, Reardon explained that his closing argument was brief because the jury had just heard the testimony of all of the witnesses he had presented on Flamer's behalf. Reardon had presented all of the mitigating circumstances which he thought would influence the jury's decision. The jury had heard evidence that Flamer was a member of a large family, and had a three-year old daughter. It had heard from Flamer, his mother, and his grandmother about the disastrous effects alcohol had already had on his life, beginning when he was five years old and later ruining his education and his marriage. The jury heard how alcohol consumption had been a key factor in his conduct on the day of the murders. It also heard that when Flamer was sober he could be caring and responsible, holding jobs and providing household assistance to his elderly grandmother. His low intelligence level was explained in two reports entered into evidence. Reardon repeated to the jury that they should keep in mind Andre Deputy's participation in the murders when they decided Flamer's fate, hinting that they should not sentence Flamer to die for Deputy's conduct. Finally, Reardon pleaded for the jury to show mercy. Brevity alone does not state a claim of ineffective assistance of counsel. *Proffitt v. Wainwright*, 685 F.2d 1227, 1250 (11th Cir.1982), *cert. denied*, 464 U.S. 1003, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983). We find Reardon's performance to be reasonable and not deficient under the *Strickland* standard.

■ Finally, Flamer contends that counsel was deficient because he did not request jury instructions on six specific points.[10] Neither Flamer in his brief, nor Saunders in his testimony, cites any authority to support the contention that in 1980 a counsel's presentation of requested instructions should have included a request that the court use the requested instructions in its charge to the jury. Indeed, as noted earlier, this Court held on direct appeal and we continue to find that the instructions actually given at Flamer's penalty phase hearing were appropriate and adequate to guide the jury's discretion. In light of our

**10.** See Section III, B. for the six instructions Flamer claims Reardon should have requested.

earlier finding and Flamer's failure to demonstrate that more detailed instructions would have changed the outcome of the trial, we find Reardon's performance to have been reasonable.

Considering the contentions raised by Flamer and the actions taken by Reardon at trial, we find that Reardon's performance, at both the guilt/innocence and penalty phases of the trial, was within the broad scope of reasonableness as set forth in *Strickland* and *Albury*.

### C.

■ Flamer also contends that his attorneys' failure to pursue an *Edwards* claim on direct appeal constitutes ineffective assistance of counsel. Such a contention must be scrutinized under the "cause" and "prejudice" standards when that failure has created a procedural default. Super.Ct.Crim.R. 61(i)(3); *Younger*, 580 A.2d at 556; *Murray*, 477 U.S. at 492, 106 S.Ct. at 2647, 91 L.Ed.2d at 411. We note that if a counsel's failure to pursue a reasonably available claim is so egregious as to constitute ineffective assistance of counsel under the Sixth Amendment, that failure is not only cause to excuse the procedural default, but also an independent ground to reverse the prior convictions. *Murray* at 488, 106 S.Ct. at 2645, 91 L.Ed.2d at 408. The Sixth Amendment, however, does not "insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 134, 102 S.Ct. 1558, 1574, 71 L.Ed.2d 783, 804 (1982).

■ Attorney error which falls short of ineffective assistance of counsel does not constitute "cause" for relief from a procedural default even when that default occurs on appeal rather than at trial. To the contrary, "cause" for relief from a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising a claim. *Murray*, 477 U.S. at 492, 106 S.Ct. at 2647–48, 91 L.Ed.2d at 411.

■ In this case, Flamer's appellate counsel were aware of the *Edwards* deci-

sion and knew or should have known of Flamer's request for counsel at his February 8, 1979 appearance in the Justice of the Peace Court. Counsel made a tactical decision not to raise or develop an *Edwards* claim. Instead, they chose to focus their efforts (as one of sixteen contentions raised) on a Sixth Amendment argument of involuntariness and compulsion with regard to the taped statement made at the police troop after Flamer's initial appearance before the magistrate. A strategy, which structures appellate arguments on "those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986). *See also Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987, 994 (1983).

Even if appellate counsel had attempted to apply the ruling in the *Edwards* case to a situation where an invocation of counsel at an initial appearance would have to be extended to the subsequent custodial interrogation of Flamer, the Court would not have been compelled by existing precedent to find that such a request was a *Miranda* invocation. In fact, in 1987, we recognized that a request for counsel for specific purposes other than interrogation is *not* an invocation of the Fifth Amendment right to counsel contemplated in *Edwards*. *Brank*, 528 A.2d at 1188. *See generally, Butler v. McKellar*, — U.S. —, 110 S.Ct. 1212, 108 L.Ed.2d 347, *reh'g denied* — U.S. —, 110 S.Ct. 1941, 109 L.Ed.2d 304 (1990); *Saffle v. Parks*, 494 U.S. —, 110 S.Ct. 1257, 108 L.Ed.2d 415, *reh'g denied* — U.S. —, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990). Under the circumstances, we find that Flamer has no concrete allegations of cause and, therefore, does not substantiate to any degree his contention of ineffective assistance of counsel during his direct appeal.

For the foregoing reasons the decision of the Superior Court is AFFIRMED.