**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. No. 9507001267 |
| | ) | |
| VARIS AIZUPITIS, | ) | |
| | ) | |
| Defendant. | ) | |

*Upon Consideration of Defendant's Motion for Postconviction Relief*
***DENIED***

*Date Submitted: November 21, 2018*
*Date Decided: February 19, 2019*

James V. Apostolico, Esq., and Andrew J. Vella, Esq., Department of Justice, Wilmington, Delaware. *Attorney for the State*.

Varis Aizupitis, *Pro se*.

**DAVIS, J.**

## INTRODUCTION

This is a criminal case after conviction.  The history regarding the post-conviction relief sought here is unusual and lengthy.  Counsel for Defendant Varis R. Aizupitis first filed a motion for postconviction relief (the "Original Motion") under Superior Court Criminal Rule 61 ("Rule 61") on February 16, 1999.  As is set forth below, the Court did not act on that first motion. After a number of hearings, the Court set a deadline for Mr. Aizupitis to file an amended motion for postconviction relief under Rule 61.  Mr. Aizupitis filed his Rule 61 Motion on June 27, 2016 (the "Motion").  The Motion amends and supersedes the Original Motion.  The Court will be considering and deciding only the issues raised in the Motion.

On July 31, 2018, the State filed its State's Response to Defendant's Motion for Postconviction Relief (the "Response").  Mr. Aizupitis filed his Motion Replying to the State

Rule 61 Answer (the "Reply") on or about August 27, 2018. In addition to the Motion, the Response and the Reply, the Court considered affidavits submitted by Mr. Aizupitis' original trial counsel ("Trial Counsel") on June 28, 2018, and April 8, 1999, and the entire record of this criminal action.

On November 21, 2018, the Court held a hearing (the "Hearing") on the Motion. At the Hearing, the Court heard argument from Mr. Aizupitis and the State. At the conclusion of the Hearing, the Court took the Motion under advisement. For the reasons set forth below, the Court will **DENY** the relief sought in the Motion.

## BACKGROUND

Mr. Aizupitis was arrested on July 4, 1995, for the murder of Elizabeth Henderson.[1] Mr. Aizupitis shot Ms. Henderson once in the right arm and once in the head with a .357 caliber handgun. After shooting Ms. Henderson, Mr. Aizupitis immediately dialed 911 and implicated himself in her death, stating "[h]ere I am. I am the one who shot her."[2] Ms. Henderson had been Mr. Aizupitis' landlord for approximately one year. Mr. Aizupitis and Ms. Henderson both resided at 1802 Wawaset Street in Wilmington. According to the record in this criminal action, for as long as Mr. Aizupitis had resided at 1802 Wawaset Street, he and Ms. Henderson had had an on-going dispute over approximately $300, which Mr. Aizupitis believed was due to him for certain repair/renovation work performed at the residence.

On July 10, 1995, a New Castle County Grand Jury returned an indictment charging Mr. Aizupitis Murder in the First Degree and with Possession of a Firearm during the Commission of

---

[1] Some of the factual background is taken from the Court's decision on Mr. Aizupitis' motion for a new trial. *State v. Aizupitis*, 699 A.2d 1098, 1099-1100 (Del Super. 1996).

[2] *State v. Aizupitis*, 1995 WL 1918900, at *1 (Del. Super. Nov. 28, 1995). According to Trial Counsel, Mr. Aizupitis gave a "full confession even stating, in your affiant's memory, the phrase: 'I stopped her and dropped her.'" Oberly 2018 aff. at ¶ 7.

a Felony.

From the record, Trial Counsel relied upon the affirmative defense of not guilty by reason of insanity and on the mitigating circumstance of extreme emotional distress. The record provides that no one disputed the fact that Mr. Aizupitis is a paranoid schizophrenic. Prior to trial, the parties and the Court were actively engaged in motions practice and pre-trial conferences regarding, among other things, expert witnesses, jury selection, discovery, jury instructions and alike.[3] The trial began on February 8, 1996. The trial was a battle of experts with three psychiatrists testifying for the defense and one psychiatrist and one neuroradiologist testifying for the State.

The jury was given the case on February 22, 1996. As to the charge of Murder in the first degree, the jury considered five possible verdicts: (1) guilty as charged; (2) guilty but mentally ill of Murder in the First Degree; (3) guilty of Manslaughter; (4) not guilty by reason of insanity; and (5) not guilty. As to the weapons charge, the jury considered four possible verdicts: (1) guilty as charged; (2) guilty but mentally ill of Possession of a Firearm during the Commission of a Felony; (3) not guilty by reason of insanity; and (4) not guilty.

After deliberating, the jury returned verdicts of guilty but mentally ill of Murder in the First Degree and guilty but mentally ill of the weapons offense. The verdicts were entered, a pre-sentence investigation was ordered, bail was revoked and sentencing was scheduled for May 3, 1996. Mr. Aizupitis then moved for a new trial. The Court denied the motion for a new trial on April 18, 1996.[4] The Court sentenced Mr. Aizupitis on May 3, 1996. Under the sentencing order, Mr. Aizupitis was committed into the custody of the Department of Corrections ("DOC")

---

[3] *See, e.g., Aizupitis*, 1995 WL 1918900, at \*1 (granting cross motions to compel discovery, including documents and reports relied upon by experts in formulating their opinions).
[4] *See Aizupitis*, 699 A.2d at 1008.

and, thereafter, was confined at the Delaware State Hospital (the "Hospital"). The sentencing order also provided that Mr. Aizupitis was to remain at the Hospital until discharge from treatment and, upon discharge, remanded back to DOC to serve a life sentence.

Mr. Aizupitis took a direct appeal of his conviction on June 5, 1996. During the appeal process, Trial Counsel withdrew and the Court appointed new counsel to represent Mr. Aizupitis. The Supreme Court affirmed the judgments of the Court on July 22, 1997.[5] The Supreme Court issued its mandate on August 11, 1997.

On August 14, 1997, the State filed a motion to transfer Mr. Aizupitis from the Hospital to a DOC facility. The Court then appointed another attorney ("Rule 61 Counsel") to represent Mr. Aizupitis. The State withdrew its motion. Subsequently, the Court denied another request to transfer on September 23, 1998.

On February 16, 1999, Rule 61 Counsel filed the Original Motion. The State responded on March 17, 1999. On March 17, 1999 and April 8, 1999, Trial Counsel filed affidavits in response to the Original Motion. On September 27, 1999, Rule 61 Counsel submitted a letter to the Court, stating that he had reason to believe Mr. Aizupitis was not "currently" competent to attend any hearing on the Original Motion. The Court ordered Mr. Aizupitis to undergo a psychiatric evaluation. After the completion of the evaluation, the Court continued any hearing on the Original Motion.

Subsequently, Mr. Aizupitis began contacting the Court for various reasons, including to inform the Court that he wanted to disclaim any representation by his Rule 61 Counsel. Upon request of Rule 61 Counsel, the Court appointed an attorney to act as Mr. Aizupitis' guardian *ad litem* (the "Guardian").

---

[5] Aizupitis v. State, 699 A.2d 1092, 1098 (Del. 1997)

4

On February 27, 2001, the Court noted that the State continued to provide reports that Mr. Aizupitis should be moved from the Hospital to DOC and that Mr. Aizupitis' representatives opposed any transfer. The Court intended to hold a joint competency/placement hearing and, at that hearing, also decide how to proceed with the Original Motion. On March 31, 2001, the Guardian informed the Court that Mr. Aizupitis was not willing to proceed on the Original Motion until his Rule 61 Counsel was dismissed.

At this time, the original trial judge retired and the case was reassigned. The Court held a status conference. On September 21, 2001, the Court ordered that Mr. Aizupitis undergo a psychiatric evaluation by the staff of the Hospital for the purpose of determining whether Mr. Aizupitis was competent to proceed with the Original Motion.

On February 26, 2002, the Court issued a letter order regarding the Original Motion. The Court stayed further proceedings in the criminal action until there was a change in Mr. Aizupitis' mental condition. The Court further provided that until there is a change in Mr. Aizupitis' status, the Court would not take further action.

On January 21, 2003, the State sought a competency hearing and a transfer of Mr. Aizupitis from the Hospital to DOC. On January 27, 2003, the Guardian submitted a letter to the Court, requesting that Mr. Aizupitis not be transferred until issues relating to Mr. Aizupitis' mental condition were resolved. On January 29, 2003, Rule 61 Counsel also wrote the Court regarding any transfer of Mr. Aizupitis from the Hospital to DOC. The Court authorized funds for Mr. Aizupitis to be evaluated by Dr. Raskin. Mr. Aizupitis refused to be evaluated by Dr. Raskin.

The Court held a competency hearing on September 29, 2003. The Court took the matter under advisement. On November 25, 2003, the Court concluded it cannot go forward on the

Original Motion without the independent evaluation by Dr. Raskin. The Court held that, so long as Mr. Aizupitis refuses to be examined by Dr. Raskin, the Court will hold a decision on the Original Motion "in abeyance." The Court further held that "if and when [Mr. Aizupitis] permits a thorough mental health examination by Dr. Raskin, the Court will conduct a supplemental hearing prior to rendering a decision [on the Original Motion], it is so Ordered."

The Rule 61 Counsel moved to withdraw representation due to a conflict of interest on May 24, 2005. On June 10, 2005, the Court appointed new counsel ("Second Rule 61 Counsel") to represent Mr. Aizupitis in connection with the Original Motion.

On February 15, 2006, Mr. Aizupitis wrote the Court. Mr. Aizupitis requested a status update on his case. The Court responded, reminding Mr. Aizupitis that the case was stayed until he agreed to be examined by Dr. Raskin.

On March 13, 2007, Mr. Aizupitis filed a petition for a writ of habeas corpus (the "Petition") with the Court. The Court denied the Petition on March 15, 2007. Mr. Aizupitis appealed to the Supreme Court. The Supreme Court affirmed the Court's decision to deny the Petition. In its decision, the Supreme Court made it clear it understood the procedural status of the Original Motion, writing:

> The record reflects that, in 1996, a Superior Court jury found Aizupitis guilty but mentally ill of first degree murder and possession of a firearm during the commission of a felony. This Court affirmed his convictions on direct appeal. Since that time, Aizupitis has been confined at the Delaware Psychiatric Center, consistent with 11 *Del. C.* § 408. *In February 1999, Aizupitis filed a motion for postconviction relief. Based on a psychiatric evaluation performed in October 1999, the Superior Court determined that Aizupitis was not competent to proceed in the postconviction proceedings. In September 2001, the Superior Court ordered a subsequent competency evaluation. The trial court stayed disposition of the matter, however, until Aizupitis agreed to be examined by an additional psychiatrist.* In March 2007, Aizupitis filed a petition for a writ of habeas corpus seeking review of the Superior Court's determination that he was not competent. The Superior Court denied the writ, and this appeal followed.[6]

---

[6] *Aizupitis v. State*, 933 A.2d 1249 (Del. 2007)(table)(emphasis added).

6

Subsequent to the denial of the Petition, the State regularly filed psychological/psychiatric reports with the Court. Mr. Aizupitis, however, continued to refuse to be examined by Dr. Raskin.

The case was subsequently reassigned on or about December 21, 2012. On June 18, 2014, the Court scheduled a status conference with the State, the Guardian and Second Rule 61 Counsel. At the status conference, the Court noted that it will not order the transfer of Mr. Aizupitis from the Hospital to DOC until the State makes a formal request under 11 *Del. C.* § 408 and a hearing is held. The Guardian took the position that (i) Mr. Aizupitis remained not competent to assist counsel with the Original Motion and (ii) the Guardian's position was probably contrary to Mr. Aizupitis' wishes.

The State filed a motion, under 11 *Del. C.* § 408, to transfer Mr. Aizupitis from the Hospital to DOC, C.A. No. N14M-10-277 EMD (the "Transfer Action"), on November 21, 2014. Because the Transfer Action involved civil law issues and not just criminal law issues, the Court appointed additional counsel to represent Mr. Aizupitis in the Transfer Action. Eventually, the Court entered a stipulated order that transferred Mr. Aizupitis from the Hospital to DOC.

On April 16, 2015, Second Rule 61 Counsel filed a motion to determine competency of Mr. Aizupitis to proceed with postconviction relief. The Court granted the motion on June 2, 2015, declaring Mr. Aizupitis competent to pursue the Original Motion.

After additional procedural practice, the Court eventually allowed Second Rule 61 Counsel to withdraw. The Court also permitted Mr. Aizupitis to proceed *pro se* on the Original Motion. Subsequently, Mr. Aizupitis filed the Motion.

**THE MOTION**

Mr. Aizupitis makes five categories of contentions for relief in the Motion. Mr. Aizupitis

7

first contends his constitutional rights to a speedy and public trial and to due process have been violated due to the length of time it has taken to resolve the Motion (including the Original Motion). Mr. Aizupitis' next three contentions all relate to claims of ineffective assistance of counsel – incompetency at trial, failure of a duty to consult and right to testify. Finally, Mr. Aizupitis seeks relief under Rule 61 due to prosecutorial misconduct, arguing that the State's use of the word "rage" during closing arguments constituted legally objectionable tactics calculated to arouse the prejudices of the jury.

The State opposes the Motion. The State first argues that the prosecutorial misconduct claim is procedurally barred. The State next contends that Mr. Aizupitis has not demonstrated that Trial Counsel representation fell below an objective standard of reasonableness and there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Finally, the State argues that any delay in resolution of the Motion is directly related to Mr. Aizupitis' own conduct and, therefore, his rights to due process have not been violated.

## LEGAL STANDARD

Before addressing the merits of a Rule 61 motion for postconviction relief, the Court must first determine whether Mr. Aizupitis has satisfied the procedural requirements of Rule 61.[7] As of February 16, 1999, Rule 61(i) established four procedural bars to postconviction relief: (1) a motion for postconviction relief may not be filed more than one year after the judgment of conviction is final; (2) any ground for relief not asserted in a prior postconviction proceeding is barred; (3) any ground for relief not asserted in the proceedings leading to the judgment of conviction is barred; and (4) any ground for relief previously adjudicated in any proceeding is

---

[7] *Younger v. State,* 580 A.2d 552, 554 (Del. 1990).

barred.[8]

The procedural bars contained in Rule 61(i)(1-4) may be rescinded only if there is a means by which to do so in the applicable subsection of Rule 61.[9] Absent such relief, Rule 61 (i)(5) provides additional reprieve from the procedural bars described in Rule 61 (i)(1-3).[10] Under Rule 61 (i)(5), "[t]he bars to relief in paragraphs (1), (2), and (3) of this subdivision shall not apply to a claim that the court lacked jurisdiction or to a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction."[11]

The Court finds that the Mr. Aizupitis contentions regarding ineffective representation by Trial Counsel are not procedurally barred under Rule 61(i)(1-4). As discussed below, the Court does find the Motion's contention regarding prosecutorial to be procedurally barred under Rule 61(i)(3).

**DISCUSSION**

### A. MR. AIZUPITIS' CONSTITUTIONAL RIGHTS TO A SPEEDY AND PUBLIC TRIAL AND TO DUE PROCESS HAVE NOT BEEN VIOLATED.

Mr. Aizupitis contends his constitutional rights to a speedy and public trial and to due process under the Sixth Amendment of the U.S. Constitution (defined by Mr. Aizupitis as the "Speedy Trial Clause") have been violated due to the length of time it has taken to resolve the Motion (including the Original Motion). Mr. Aizupitis, however, relies on a line of cases that were "abrogated" the United Supreme Court's decision in *Betterman v. Montana*.[12]

---

[8] Super. Ct. Crim. R. 61(i).
[9] *State v. MacDonald,* 2007 WL 1378332 *4 (Del. Super., May 9, 2007).
[10] *Id.*
[11] Super. Ct. Crim. R. 61(i)(5).
[12] 136 S. Ct. 1609 (2016).

9

In *Betterman*, the United States Supreme Court held that the Sixth Amendment's speedy trial guarantee, *i.e.*, the Speedy Trial Clause, protects the accused from arrest or indictment through trial, but does not apply once a defendant has been found guilty at trial or has pleaded guilty to criminal charges. The *Betterman* decision abrogates those cases, including *Burkett v. Cunningham*, that applied the Sixth Amendment's speedy trial guarantee to postconviction delays.[13] Specifically, the United State Supreme Court stated that the Sixth Amendment's speedy trial clause only addresses that aspect of a criminal action that involves the period from arrest or indictment through conviction but detaches upon conviction.[14] This is because the presumption-of-innocence-protective speedy trial right is no longer implicated after conviction through a trial or a guilty plea.[15]

Mr. Aizupitis mentions "due process" concerns but only as these concerns relate to the speedy trial guarantee. Due process, under a pliable standard, could be implicated in undue delay. The Court acknowledges that the time between the filing of the Original Motion and resolution is twenty (20) years; however, the delay is not attributable to the State or the Court ignoring procedural safeguards. The record demonstrates that the parties and the Court engaged in an orderly process to address the Original Motion but, in the end, were stymied by Mr. Aizupitis' refusal to undergo an assessment by Dr. Raskin. Moreover, the Court has responded to and ruled on those matters placed before, *e.g.*, the Petition—which was also addressed by the Supreme Court with full understanding of the procedural history of the Original Motion.[16]

---

[13] *Id*. at 1613, n.1. The Court has included the reference to *Burkett v. Cunningham*, 826 F.2d 1208 (3d Cir. 1987) given Mr. Aizupitis' heavy reliance upon this case for his Speedy Trial/Due Process constitutional claim.

[14] *Id*. at 1613-14.

[15] *Id*. at 1617.

[16] *Aizupitis*, 933 A.2d at 1249 ("In February 1999, Aizupitis filed a motion for postconviction relief. Based on a psychiatric evaluation performed in October 1999, the Superior Court determined that Aizupitis was not competent to proceed in the postconviction proceedings. In September 2001, the Superior Court ordered a subsequent competency evaluation. The trial court stayed disposition of the matter, however, until Aizupitis agreed to be examined by an additional psychiatrist.").

Under the facts present here and the applicable law, the Court holds that Mr. Aizupitis'

constitutional rights under the Sixth Amendment and to due process

### B. MR. AIZUPITIS' PROSECUTORIAL MISCONDUCT CLAIM IS PROCEDURALLY BARRED.

Under Rule 61(i)(3), a claim not asserted in the proceedings leading to the judgment of

conviction is procedurally barred. Claims regarding prosecutorial misconduct are the types of

claims that should be raised during the direct appeal process.[17] If raised for the first time in a

Rule 61 motion, a defendant must show that: (i) "some external impediment" prevented him

from raising the claim on direct appeal and (ii) he was prejudiced in that the outcome would have

changed had the issue been raised before.[18]

Mr. Aizupitis contends that the State committed prosecutorial misconduct in that the

word "rage" was used during closing arguments at trial. Mr. Aizupitis is not 100% clear as to

what impediment prevented the prosecutorial misconduct issue from being raised on direct

appeal. Mr. Aizupitis seems to lay the blame on Trial Counsel and the Court for not addressing

the use of "rage" at trial but does not explain why the matter was not raised on appeal by his

newly appointed appellate counsel. Mr. Aizupitis also contends that the outcome would have

been different because state of mind was critical in the trial.

The Court does not accept Mr. Aizupitis' arguments. First, the argument regarding Trial

Counsels' failure to object does not explain why the issue could not have been raised on appeal.

This is especially true in that Mr. Aizupitis contends that the use of the word "rage" constituted

plain error. Second, the Court cannot agree with Mr. Aizupitis' contention that the word of

"rage" in a murder trial can be compared to injecting "race" into a trial as done in *Weddington v.*

---

[17] *See, e.g., State v. Desmond*, 2006 WL 2221005, at *2 (Del. Super. Aug. 2, 2006), *aff'd* 937 A.2d 139 (Del. 2007)(table).

[18] Super. Ct. Crim. Rule 61(i)(3)(A); *see also Younger*, 580 A.2d at 556; *Flamer v. State*, 585 A.2d 736, 748 (Del. 1990).

*State,*[19] especially when very little context is provide other than timing and tone. This is particularly true when the word was used only once and it was used in a case involving the uncontested fact that Mr. Aizupitis shot an unarmed victim twice—once in the arm/torso and once in the head—with a handgun.

Because the prosecutorial misconduct claim is procedurally barred, Mr. Aizupitis must satisfy the "fundamental fairness" exception contained in Rule 61(i)(5).[20] Mr. Aizupitis bears the burden under Rule 61(i)(5).[21] Rule 61(i)(5) provides a narrow exception that applies in limited circumstances such as when the right relied upon has been recognized for the first time after the direct appeal.[22] The fundamental fairness exception does not apply to a mistake committed at trial or on appeal. Instead, the mistake must be a "miscarriage of justice" so substantial as to call into question whether the defendant is innocent or the conviction was wrong. The factual and procedural record, despite all the Motion's hyperbole, does not support a finding that the use of the word "rage" was so inflammatory that the jury ignored the fact that Mr. Aizupitis was innocent or that the conviction was wrong.

### C. Mr. Aizupitis' Ineffective Assistance of Counsel Claims Fail Under the Strickland Analysis.

Mr. Aizupitis asserts a number of ineffective assistance of counsel claims. The standard used to evaluate a claim of ineffective assistance of counsel is the two-pronged test articulated by the United States Supreme Court in *Strickland v. Washington,*[23] and adopted by the Delaware Supreme Court in *Albury v. State.*[24] Under *Strickland*, the defendant "must establish both (1)

---

[19] 545 A.2d 607 (Del. 1988)(prosecutor injected unsubstantiated issues of race during the cross-examination of the defendant).
[20] *State v. Taylor*, 2000 WL 33113935 (Del. Super. Oct. 27, 2000).
[21] *Younger*, 580 A.2d at 555.
[22] *Id.*
[23] 466 U.S. 668, 687 (1984)
[24] *State v. Sykes*, 2014 WL 619503 *12 (Del. Super. Jan 21, 2014) (citing *Flamer v. State*, 585 A.2d 736, 754 (Del. 1990)); *State v. Gattis,* 1995 WL 790961, at *3 (Del. Super. Dec. 28, 1995).

deficient performance by trial counsel and (2) prejudice suffered as a result of the deficient performance."[25]  Failure to establish either prong of the test will result in a denial of the defendant's claim for relief.[26]

In order to satisfy the first prong of the *Strickland* test, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness.[27]  There is no exact standard used to determine reasonably effective assistance of counsel, rather, performance is measured under prevailing professional norms.[28]  "Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides."[29]  In *Strickland*, the United States Supreme Court recognized that there is more than one way for counsel to provide effective assistance in any given case, noting that equally competent attorneys may tactically approach the same case in a different manner.[30]  Moreover, the movant must overcome a strong presumption that counsel's performance was within the "wide range of reasonable professional assistance."[31]

The second prong of the *Strickland* test requires that the defendant prove that it is reasonably probable that, but for the mistakes of counsel, "the fact finder would have had a reasonable doubt respecting guilt."[32]  In *Strickland*, the United States Supreme Court defined reasonable probability as "a probability sufficient to undermine confidence in the outcome."[33]  In determining whether the defendant suffered prejudice as a result of ineffective assistance of

---

[25] *Id.* (citing *Strickland*, 466 U.S. at 687).
[26] *Id.* (citing *Strickland*, 466 U.S. at 697).
[27] *Strickland*, 466 U.S. at 688.
[28] *Sykes*, 2014 WL 619503, at *13 (citing *Strickland*, 466 U.S. at 688).
[29] *Strickland*, 466 U.S. at 688.
[30] *Id.* at 689.
[31] *Gattis*, 1995 WL 790961, at *4 (citing *Strickland*, 466 U.S. at 689).
[32] *Strickland*, 466 U.S. at 695.
[33] *Id.* at 694.

counsel, the Court must consider the "totality of the evidence before the judge or jury."[34] The showing of prejudice is essential to a claim of ineffective assistance of counsel, and thus, the court in *Strickland* stated "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."[35] Furthermore, "[i]f the defendant fails to 'state with particularity the nature of the prejudice experienced,' such failure is 'fatal to a claim of ineffective assistance of counsel.'"[36]

As set forth more fully below, the Court does not find merit to any of Mr. Aizupitis' ineffective assistance of counsel claims. Even viewed in "hindsight," Trial Counsel's representation of Mr. Aizupitis did not fall below an objective standard or reasonableness. Moreover, Mr. Aizupitis cannot demonstrate that it is reasonably probable that, but for the alleged mistakes of Trial Counsel, the jury would have had reasonable doubt as to Mr. Aizupitis' guilt.

### *Incompetency at trial*

Mr. Aizupitis contends that Trial Counsel were ineffective because they failed to obtain a competency determination prior to trial. Mr. Aizupitis argues that he was not competent to stand trial, that his conduct was such that his incompetency should have been recognized, and that his post-trial treatment supports his argument that he was incompetent to stand trial.

The record indicates otherwise. First, Trial Counsel state in their affidavits that they closely monitored Mr. Aizupitis with the understanding of the standard of competency under Delaware law.[37] Moreover, Trial Counsel retained the services of Dr. Raskin prior to trial.[38] Dr.

---

[34] *Id.* at 695.
[35] *Id.* at 697.
[36] *Sykes*, 2014 WL 619503, at *13 (citing *Dawson v. State*, 673 A.2d 1186, 1196 (Del. 1996)).
[37] Oberly 1999 aff. at ¶ 2.; Jennings 1999 aff. at ¶¶ 1.a.-g. 2-6.
[38] Oberly 1999 aff. at ¶ 2.

14

Raskin met with Mr. Aizupitis ten times before trial.[39]  Dr. Raskin told trial counsel that he

would monitor Mr. Aizupitis' competency to stand trial and alert counsel if a genuine issue

arose.[40]  Trial counsel did state that Mr. Aizupitis became less stable through the trial but, again,

counsel appears to have made the decision to continue based on experience, assistance from Dr.

Raskin and a mid-trial colloquy from the trial judge.[41]  According to Trial Counsel, Dr. Raskin

continued to see Mr. Aizupitis during the trial and provided a verbal report to the Court

regarding competency.[42]

It appears from the record that Trial Counsel were aware of his mental condition,

monitored it, obtained professional medical assistance and involved the Court when necessary.

All of this indicates that Trial Counsel's representation of Mr. Aizupitis was effective and did not

fall below an objective standard of reasonableness as that representation relates to his

competency to stand trial.

Also relevant to the Court's conclusion is the record after trial—the appeal and

postconviction representation.  The record indicates that, despite the verdict of guilty but

mentally ill, appellate counsel felt that Mr. Aizupitis was able to assist appellate counsel during

the appeal.  In fact, the first person to raise Mr. Aizupitis' competency to stand trial was Rule 61

Counsel—who was first appointed on September 12, 1997.  Rule 61 Counsel first raised the

claim in the Original Motion on February 16, 1999. [43]  Almost two years after being appointed to

represent Mr. Aizupitis, on September 27, 1999, Rule 61 Counsel submitted a letter to the Court,

---

[39] Jennings 1999 aff. at ¶ 1.b.

[40] *Id.*

[41] *Id.* at ¶ 6B.1 ("When I raised the issue of competency and when the Court raised it as well, Dr. Raskin opined that Mr. Aizupitis met the basic standards [of competency]").

[42] *Id.* at ¶ 1.f (citing to the February 20, 1996 trial transcript at 239-240).

[43] The Original Motion does make the same argument regarding a pre-trial competency evaluation.  It is not clear, however, whether Rule 61 Counsel knew whether Mr. Aizupitis was incompetent or whether Trial Counsel was obligated to request a competency hearing before trial.  Rule 61 Counsel, however, makes conclusory statements regarding competency during trial without any supporting medical opinion.

stating that he had reason to believe Mr. Aizupitis was not "currently" competent to attend any hearing on the Original Motion. So, from August 22, 1996 through September 27, 1999, lawyers for Mr. Aizupitis (other than his trial counsel) interacted with him and none found it necessary to raise the issue of his competency—with the Court, the Supreme Court or anyone else—to pursue his appeal or postconviction relief.

The Court is satisfied that trial counsel provided representation regarding failing to request a competency hearing before trial did not fall below an objective standard of reasonableness.[44]

### *Duty to Consult*

Mr. Aizupitis contends that his trial counsel provided ineffective assistance at trial because they failed to consult with him on issues regarding "strategy at trial," "release of confidential materials," and a "state of mind witness." Mr. Aizupitis claims that Trial Counsel did not provide him with information regarding available affirmative defenses, lesser included offenses or otherwise consult with him on trial strategy.

Trial Counsel directly addresses the issue of "release of confidential matters." This was a case requiring expert witness testimony. As such, Mr. Aizupitis met with psychiatric experts who examined him to determine whether he suffered "from a mental illness and whether as a result he met the legal criteria for guilty but mentally ill, not guilty by reason of insanity or

---

[44] Trial Counsel does candidly recognize the difficulty Mr. Aizupitis' competency in her 1999 affidavit. Oberly 1999 aff. at 3-4; Jennings 1999 aff. at 7-8. Trial counsel even suggests a remedy used in *Harris v. State*, 410 A.2d 500 (Del. 1979). The Court has reviewed the ruling in *Harris*. *Harris* involves a case where trial counsel and the Court had no idea that the defendant might have a mental condition that could have made him incompetent to stand trial. *Id*. at 501. After trial, Mr. Harris' counsel reviewed Mr. Harris' conduct before and during trial and felt that, after reflection, it was possible that Mr. Harris may not have comprehended the seriousness of the situation. *Id*. Here, Mr. Aizupitis' mental condition was known prior to trial, was monitored throughout trial by a doctor and Mr. Aizupitis' counsel felt he did comprehend what was going on during trial—able to provide counsel with pertinent facts, motivated in his defense, appreciated the charges and was able to relate to his attorneys. Jennings 1999 aff. at 8.

extreme emotional distress."[45] During this process, Mr. Aizupitis provided information to his experts and the experts formed opinions based on this information. Accordingly, in order to testify, Mr. Aizupitis' experts had to turn this information over during discovery.[46] In addition, Trial Counsel felt that this information was relevant and helpful to Mr. Aizupitis' defense.[47]

Mr. Aizupitis seems to believe that Trial Counsel merely turned the information over to the State without consulting him. The record indicates otherwise. Instead of this being a unilateral decision by Trial Counsel to turn over confidential information, Trial Counsel turned over the information relied upon by Mr. Aizupitis' experts as required when an expert opinion is rendered and used in trial.[48] In fact, the Court ordered such disclosure of materials.[49]

Mr. Aizupitis' complaints that Trial Counsel did not consult with him regarding available affirmative defenses, lesser included defenses, particular witnesses and alike are refuted by trial counsels' affidavits.[50] Trial Counsel laid out in detail their approach to trial and their interaction with Mr. Aizupitis. Trial Counsel and Mr. Aizupitis discussed: (i) the relevant and pertinent facts; (ii) the charges and range and nature of penalties; (iii) affirmative defenses (including— given the actual facts—an implausible self-defense strategy);[51] (iv) the role of counsel in the trial process; and (v) the import of witness' testimony.[52]

Mr. Aizupitis spends time discussing the testimony of his grandfather, Warner Gardner. Mr. Aizupitis contends that in a phone call with Mr. Gardner prior to the shooting he acted in a

---

[45] Jennings 2018 aff. at ¶¶ 2-4.
[46] *Id*. at ¶¶ 5-7.
[47] Id. at ¶ 7.
[48] *See, e.g.*, Del. R. Evid. 702. Moreover, the Court required Mr. Aizupitis' trial counsel to turn over all materials that the experts used to formulate their opinions.
[49] *See State v. Aizupitis*, 1995 WL 1918900, at *4 (Del. Super. Nov. 28, 1995).
[50] *See, e.g.*, Oberly 2018 aff. at ¶ 7.
[51] Mr. Aizupitis used deadly force in a factual situation that does not support the defense of justification under Delaware law. The victim was not armed and nothing indicated that Mr. Aizupitis could not have avoided the use of deadly force by safely retreating, etc. *See* 11 *Del C.* § 464(e)(2).
[52] *See* Jennings 1999 aff. at ¶ 6.A.2-6 and ¶ 6.B.1-3 and 5.

manner that supported the "not guilty by reason of insanity" defense. Mr. Aizupitis believed that Mr. Gardner would testify as such at the trial. The Court granted leave to take Mr. Gardner's deposition for use at trial. The deposition was played at trial but, now, Mr. Aizupitis contends it was not what he thought it would be and that trial counsel should have discussed the deposition more with him prior to its use. To demonstrate ineffective assistance of counsel on tactical decisions, Mr. Aizupitis must demonstrate what information could have been obtained and how this information would have changed the result. As presented, the "missing" testimony of Mr. Gardner may have been helpful as supporting the defense or the expert opinions regarding state of mind. But Trial Counsel's representation, as it relates to Mr. Gardner's potential testimony, was a tactical decision that does not seem to fall below an objective standard of reasonableness. Moreover, Mr. Aizupitis has not demonstrated prejudice if that representation was deficient.

Even if Mr. Gardner had testified in the manner Mr. Aizupitis believes he would have testified, there is no indication that the outcome would have been different. At trial, the defense provided evidence as to Mr. Aizupitis' state of mind. In fact, Trial Counsel thought a strong case had been presented at trial on Mr. Aizupitis' behalf.[53] The jury did not agree. This result, however, does not mean that the failure to present Mr. Gardner's testimony as Mr. Aizupitis conceptualized it would have provided for a different outcome.

Mr. Aizupitis' claims regarding lesser included offenses are, again, belied by the record. Trial Counsel's affidavits lay out the tactical considerations on why murder in the second degree was not requested.[54] Moreover, trial counsel engaged the Court regarding lesser included offenses.[55] At trial, the Court instructed the jury as to the indicted charges, the lesser included

---

[53] *See* Oberly 1999 aff. at ¶ 7.
[54] See Oberly 2018 aff. at ¶ 7.
[55] *Id.*

18

offense of manslaughter and extreme emotional distress.[56]

Mr. Aizupitis fails to satisfy the *Strickland* test on his duty to consult contentions. Mr. Aizupitis has not demonstrated that Trial Counsel's performance fell below an objective standard of reasonableness. There is more than one way for counsel to provide effective assistance in any given case. Equally competent attorneys may tactically approach the same case in a different manner. Mr. Aizupitis is arguing that different approaches could have been taken but not that Trial Counsel's performance was not within the "wide range of reasonable professional assistance."[57]

In addition, Mr. Aizupitis has not proven that it is reasonably probable that, but for the mistakes of counsel, the fact finder would have had a reasonable doubt respecting guilt. In considering the totality of the evidence that went to the jury in this case, the Court cannot conclude that the result would have been different even if Trial Counsel had consulted with Mr. Aizupitis in the manner argued in the Motion.

### *Right to Testify*

Mr. Aizupitis claims that his Trial Counsel was ineffective with respect to his right to testify or not testify at trial. Specifically, Mr. Aizupitis contends that Trial Counsel was ineffective because they did not let him testify at trial, and that they coerced him into not testifying. The record indicates otherwise.

First, Trial Counsel specifically remembers advising Mr. Aizupitis on his right to testify or not testify at trial.[58] Dr. Raskin was also available to counsel Mr. Aizupitis on the issue of testifying at trial.[59] Trial Counsel state that they did not believe that Mr. Aizuputis should testify

---

[56] *Id.*
[57] *Gattis*, 1995 WL 790961, at *4 (citing *Strickland*, 466 U.S. at 689).
[58] *See* Oberly 2018 aff. at ¶ 5; Oberly 1999 aff. at ¶ 3-6.
[59] Oberly 1999 aff. at ¶ 3.

19

in his own defense for a variety of reasons—*e.g.*, that his demeanor would not be well received by a jury—but also made it clear to Mr. Aizupitis that the final decision to testify was his to make.[60]

Second, the Court addressed Mr. Aizupitis at trial about his right to testify.[61] During the Court's colloquy, Mr. Aizupitis stated that he understood the issue and that he did not want to testify.[62] After this exchange, the Court made the determination that Mr. Aizupitis' choice not to testify was ultimately his choice.[63]

Nothing in the record, other than statements made in the Motion, indicate that anyone, Trial Counsel, the Court, etc., "coerced" Mr. Aizupitis into not testifying.

The record of this case demonstrates that Mr. Aizupitis, after meeting with Trial Counsel and Dr. Raskin, informed the Court that he was electing not to testify. On this record, the Court finds that it is clear that Trial Counsel's representation with respect to Mr. Aizupitis' right to testify does not fall below an objective standard of reasonableness.

## CONCLUSION

Accordingly, for the reasons stated above, Mr. Aizupitis' Rule 61 Motion is **DENIED.** **IT IS SO ORDERED.**

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:  Original to Prothonotary

---

[60] *Id.* at ¶ 5.
[61] Oberly 2018 aff. at ¶ 5.
[62] *Id.*
[63] *Id.*