IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE    )
                     )
    V.               )    ID Nos. 1605012000 and
                     )    1606022078
                     )
MARIO W. MARENO,     )
                     )
        Defendant.   )

## MEMORANDUM OPINION

Submitted: September 30, 2019
Decided: January 27, 2020

*Defendant's Motion for Postconviction Relief.*
**DENIED.**

Christian D. Wright, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Attorney for the State.

Christopher S. Koyste, Esquire, Law Office of Christopher S. Koyste, LLC, Wilmington, Delaware. Attorney for Defendant.

**BUTLER, J.**

The Court is familiar with the case of *State v. Mareno*, having presided over numerous pretrial matters, a guilty plea and an unusual sentencing that included approximately a half-day of testimony from the victims of Mario Mareno's ("Mareno") home improvement frauds. After Mareno's sentencing, there were several motions to modify the sentence under Rule 35, and eventually, a motion under Rule 61, related to ineffective assistance of counsel.[1] The Court appointed new counsel to represent Mareno in the Rule 61 proceeding and counsel filed a compendious amended motion and brief.[2] This is the Court's ruling on Mareno's amended Rule 61 motion.

## FACTUAL AND PROCEDURAL BACKGROUND

Mareno was a home improvement contractor operating in Delaware. The charges giving rise to the instant case ran from March 2015 until June 2016. The lead charge of the indictment was criminal racketeering followed by a litany of theft and home improvement fraud counts,[3] each a story of homeowners' thwarted expectations and a contractor's broken promises.

Mareno was represented by private counsel. There was more than a little bit of pretrial skirmishing, particularly concerning discovery and financial information about the amount and scope of the harm done. Mareno also peppered the Court with

---

[1] Petitioner's Motion. D.I. 56.
[2] *Id.*
[3] Motion Appendix. A105-A125.

1

*pro se* papers, mostly related to his counsel, discovery and the schedule. Since none of that survives to the Rule 61 motion, it need not be chronicled here. Like so many financial fraud cases, this one resolved with a plea agreement that, regardless of the counts to which the defendant pled guilty, required the defendant to be financially responsible for all of the harm done, whether or not that particular victim appeared in the final guilty plea counts.

Trial was scheduled to begin on December 12, 2017. On November 20, Mareno tendered a guilty plea to the Court.[4] Under the terms of the plea agreement, Mareno pled guilty to four counts of felony theft and four counts of felony home improvement fraud.[5] The other terms of the agreement were these: 1) the State would cap its Level V sentencing recommendation at 6 years, 2) the sentence would include a probation term for restitution, 3) Mareno will no longer work as a contractor in Delaware, or hold a position with financial authority in employment, 4) Mareno will disclose his conviction to future employers or clients, 5) the probation, when it comes, may be transferred to North Carolina, and 6) the remaining charges would be *nolle prossed.*[6] Finally, it was agreed that sentencing would take

---

[4] Motion Appendix. A126.
[5] *Id.* at A130.
[6] *Id.* at A137-39.

2

place without a presentence investigative report, but the Court would set aside time to permit live or written testimony by the victims during the period set for the trial.[7]

The Court accepted the plea as written. The plea colloquy and the details of the agreement are not challenged in this Rule 61 proceeding. The Court further agreed to hear from the victims on December 12, as set forth by the parties in the plea agreement.

In the weeks following acceptance of the plea, the State filed a Sentencing Memorandum in which it detailed the harm caused to a number of the victims by Mareno's frauds.[8] As one can imagine, it was not a pretty sight. Among the revelations was the fact that this was not Mareno's first rodeo. In 2007 he was convicted of home improvement fraud and in 2011 he was convicted again, this time of 3 counts of felony home improvement fraud, 1 count of felony new home construction fraud, and a misdemeanor count of improper retention of contractor funds.[9]

As the sentencing hearing began, the Court commented to the assembled victims:

> I'm not bound by the State's recommendation in every case, but you should understand if I blow up the State's recommendation then defendants don't plead anymore because they can't count on the

---

[7] *Id.* at A138-39.
[8] Motion Appendix at A163.
[9] *Id.* at A164.

3

recommendation from the State. So the bias has to be in favor or honoring the agreements, unless there's an egregious reason not to. So I guess what we're really talking about is where around 6 years should this sentence reside. Should it be above it, below it, or at it. And that's where I am with the case.[10]

It is worth noting here that contractor frauds involving home improvement are not "ordinary" thefts. They usually involve relatively large sums of money, gathered by homeowners over many years of saving or borrowing, and their single biggest and most prized investment, the family home. This case is such an example. The victim impact witnesses were powerful, devastating and very real. To appreciate that Mareno had twice previously been convicted of the exact same behavior, the most recent being a significant conviction of multiple charges of fraud, is to understand that the Court had to act with restraint to keep its sentence within the confines of the plea agreement.[11]

Nonetheless, after hearing from a morning full of victim/witnesses, some of them tearfully describing the loss of years of savings, their dreamed improvements, and the use of their homes, the Court imposed 6 years at Level V in accordance with the State's agreed cap in the plea agreement.

The Court considered all of the evidence presented at the sentencing hearing, as well as the comments and arguments of counsel and Mareno's prior convictions

---

[10] *Id.* at A172.
[11] Motion Appendix. at A.197.

4

for the same species of conduct. The Court explained to the many victims assembled in the courtroom:

> You can't look at this invasion of your life that occurred here and say this is not deserving of a jail sentence, you can't do that. The insult to you is too severe. And it would insult the case to let the man get away. And it would insult the case, it would insult the priors not to aggravate the sentence.
> You have been here twice on Home Improvement Fraud and back out again committing the scale and the scope of the frauds in this case, it makes no sense at all.[12]

Mareno was sentenced to 9 months at Level V for each of the 8 felony charges to which he had pled guilty.[13]

## ISSUES RAISED BY THE DEFENDANT

Post-conviction ("PCR") counsel has made the following arguments to the Court. First, counsel says that trial counsel failed to present character witnesses that would have humanized Mareno before the Court.[14] These witnesses are former

---

[12] Motion Appendix. at A197.

[13] Petitioner's Motion. D.I. 56 at 2. As to restitution, it is one of the ironies in this case that Mareno was already in default of some $200,000 in restitution payments to the victims of his last trip through the courthouse, in 2011. The restitution in this matter, which will surely be in the same range as the previous order, has yet to be determined as the parties have deferred the hearing in light of Mareno's jail sentence. As one of the victims in this case testified "He's 50 years old. If he was to walk out of the courtroom today and a month from now and make $1,000 payments and he did that every month for the next 25 years, he would pay off the restitution that he already owes before today. Then you have a 75 year old man who if he paid another $1,000 a month for the next 25 years he would finally pay off all of the restitution that he'll owe after that today." Motion Appendix. at A179.

[14] Petitioner's Motion. D.I. 56 at 18.

5

customers that would have shown Mareno was well thought of by some (who were not complainants in the fraud cases).[15] Second, it is argued that trial counsel was ineffective for not challenging certain comments by some of the victims that testified at the sentencing hearing.

The record has been supplemented by an affidavit of trial counsel and a brief in opposition filed by the State.

## ANALYSIS

A.    *The Satisfied Customer Witnesses*

PCR counsel's pleadings are long on legal standards of ineffective assistance and short on specific details of exactly what trial counsel did or did not do, but for which, Mareno would not have suffered the consequences he did. While the legal standards are well known and hardly controversial,[16] the demonstration of prejudice to the defendant remains elusive.[17]

For example, PCR counsel has appended an affidavit from his law clerk, swearing that four witnesses were contacted post-conviction that said they were satisfied with Mareno's work performance.[18] These witnesses, it is alleged, would

---

[15] *Id.* at 18-19.

[16] *Strickland v. Washington*, 466 U.S. 668, 688-98 (1984) *accord Flamer v. State*, 585 A.2d 736, 752 (Del. 1990).

[17] "Mere allegations of ineffectiveness will not suffice. A defendant must make specific allegations of actual prejudice and substantiate them." *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).

[18] Motion Appendix. at A273.

6

have been available to trial counsel had he searched for them and, his failure to find them was deficient performance.

The first problem with this argument is that it is factually erroneous. As set forth in trial counsel's affidavit, he was provided the names of some satisfied customers by Mareno and his girlfriend, but those witnesses were unresponsive despite repeated attempts to reach them.[19] Having been given short shrift by these potential witnesses, trial counsel made the professionally reasonable decision to abandon this line of "defense" given that their value as mitigation witnesses was dubious.[20]

The argument presented here assumes that the Court believed Mareno was not really a contractor at all but rather a wanton thief and that had these witnesses testified, the sentence here likely would have been different. Both of these underlying assumptions are simply false.

Without plumbing the deliberative process of the Sentencing Court, it is sufficient to note that satisfied customers add very little to the equation. Mareno was surely loved by his family, presumably had numerous friends who thought he was a swell fellow, and successfully completed at least some of the jobs for which he had contracted. These facts, all of which may be presumed, must be balanced

---

[19] Malik Affidavit. D.I. 63 ¶ 16
[20] *Id.* ¶ 17.

against the enormity of the harm done by Mareno's frauds, to which he pled guilty and about which there is likewise, no doubt.

Additionally, as the State points out, witnesses to Mareno's *competent* work on behalf of some clients contradicts the central theme of Mareno's claim in mitigation that he was merely *incompetent* and not of malicious intent.[21] Given the marginal relevance of satisfied customers and the inconsistency of such testimony with the basic thrust of Mareno's mitigation case, the Court finds that abandoning the search for these witnesses was professionally reasonable and in any event, their absence from the sentencing proceeding did not likely effect the outcome of the sentencing.

B.    *The Failure to Challenge Victim Testimony.*

Mareno himself insisted that he did not want a presentence investigation performed.[22] The parties specifically negotiated this point as spelled out in the plea agreement. It is reasonable to infer that Mareno's interest was to get on with the sentencing so he would no longer be considered a pretrial detentioner, a status that freezes inmates out of access to some prison programming and meritorious good time credits. It is also reasonable to infer that the State was willing to forego the

---

[21] Motion Appendix. at A154.
[22] *Id.* at A155.

delay caused by a presentence report so long as it could secure court time to allow the victims to speak directly to the sentencing judge.

While the plea arrangement regarding sentencing had advantages for both parties, one of the things it did *not* do was give Mareno's trial counsel an advance look at exactly who would speak at sentencing or what they would say.[23]

Now, with the benefit of a sentencing transcript, PCR counsel argues that some of the victim witnesses did not testify truthfully. For proof of these misstatements, Mareno points to the testimony of Ms. Gonzalez ("Gonzalez"), who had water damage to her basement and contracted with Mareno for repairs. She says she gave him $3500 and, essentially, he did not do the repairs or they were so poorly done she had to do them again.[24] Mareno complains that Gonzalez did not explain to the Court that this was an insurance reimbursement contract. Further, he says there was a problem with the insurer covering certain upgrades necessitated by the County Code and any delay was unavoidable because of the insurance company. This position is somewhat supported by 2 or 3 emails from Mareno to the insurance company. But Mareno then overstates the point by arguing that the delay was, "to an extent," due to the delays by the insurance company.[25] The point, however is not simply delay. Gonzalez testified that she was at home, recovering from knee

---

[23] Malik Affidavit. D.I. 63 ¶¶ 38-40.
[24] Motion Appendix at A177-78.
[25] Petitioner's Motion at 25.

9

replacement surgery, and she trusted Mareno to do the job within the insurance budget. Some subcontractors did show up, but "some of the work was shabby to say the least. He brought bad materials that we tried to contact him to talk to him about it, which he would not call my husband to talk to him about or myself."[26]

Gonzalez continued, "on top of the little bit of work he did plus the bad materials, you know, I'm probably in for a few thousand dollars, which is why I say I'm probably the least impacted."[27] Thus, Gonzalez' complaint was not one of delayed repairs. Contesting her testimony would have proven nothing. Rather, it was one of many tales of Mareno dragging his feet, performing substandard work with substandard materials and eventually abandoning the project completely. There is no reasonable likelihood that, had Gonzalez been "confronted" with the fact that the insurance company was reluctant to pay for upgrades necessitated by changes to the County Code, the resulting sentence would have been different.

The second complaint is about the testimony of Mr. Jeffrey Lehnart ("Lehnart"). It is alleged that Lehnart's testimony that he "did everything he could" to resolve his dispute with Mareno is belied by some emails between Lehnart and Mareno's attorney, Dominic Balascio ("Balascio"), in which Lehnart eventually ceased communications with Balascio.[28]

---

[26] Motion Appendix at A177.
[27] *Id.*
[28] Petitioner's Motion. D.I. 56 at 26.

10

This is a demonstrably bad argument. Lehnart was a probation officer who, with his wife, lost $15,000 to Mareno.[29] Mareno got a deposit on the job, allegedly in order to pull permits that were never pulled.[30] He had contractors in Lehnart's basement for about 3 days in the span of 5 weeks.[31] He allegedly sent an HVAC technician to the site who was not, in fact, an HVAC technician.[32] When Lenhart fired Mareno after learning he had never pulled the proper permits, Mareno had the temerity to seek payment from Lenhart and turned him over to Balascio.[33]

The emails between attorney Balascio and Lehnart are part of this record.[34] While the original deposit is not identified specifically, the parties trade emails with potential settlements that had Mareno returning $6,000, $7,500, $9,000 and $11,000 at different points in the negotiation. Another problem with the settlement was exactly who would release whom and from what. This was not a simple matter and it is difficult to say, on a cold, written record, whether either side was being particularly unreasonable. But an email from attorney Balascio does stand out. After making his offer, the attorney said:

> At 5 pm today, I am going to move forward with all necessary legal action against you and your wife. I will start by contacting the AG's office, the police, a judge at the magistrate's office (since you are using

---

[29] Motion Appendix at A178.
[30] *Id.* at A179
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.* at A248-53.

11

the police and parole officer), the State to let them know about matter [sic] and your use of the State system, and the Office of Parole. We are going to shut down all your avenues. And, I am going to file a civil suit against both of you. Provide you notice of deposition. And, let the games begin. Your choice. I hope you are wise enough to see the benefits.[35]

Lehnart testified that this was the last communication he had with attorney Balascio.[36] Given its tone and tenor, that is a completely understandable reaction. Having reviewed all of the emails, the Court does not find that Lehnart's testimony that he did "everything he could to try and resolve the matter" was a material misstatement or that, upon consideration of the full record of emails, Mareno's sentence would have been different.

Finally, PCR counsel points to the testimony of Mr. Lance Fontello ("Fontello").[37] Like Gonzalez, PCR counsel faults trial counsel for failing to cross examine Fontello about the insurance arrangements for payment of the repairs.[38]

The Fontello case was a particularly painful story. In June, 2015, a tree fell on their modest, 740 square foot home.[39] At the time, the Fontellos were attempting to gain custody of their nephew, who was in foster care after the child's father, Fontello's brother, passed away.[40] The home was insured and the Fontellos went to

---

[35] Motion Appendix at A249.
[36] *Id.* at A179.
[37] Petitioner's Motion. D.I. 56 at 26.
[38] *Id.* at 26.
[39] Motion Appendix. at A180.
[40] *Id.*

12

live in a rental property during repairs.[41] Mareno produced a drawing that proposed adding an additional bedroom, along with assurances that the insurance company would "have to" permit the redesign.[42] This was good news because the Fontellos believed a four bedroom house would improve their position in litigation seeking custody of their nephew.[43]

The insurance company did not approve the four bedroom proposal but did approve three draws of $15,000 each to pay for the repairs: an initial draw and a second and third at 35% and 70% completion.[44] Mareno got the first draw and was supposed to buy materials and commence work.[45] Despite his promises of prompt completion, progress was slow, in part due to zoning issues beyond anyone's control. Then there were "weather delays" and other delays. Despite the lack of progress, Mareno pressed for the progress payment, only available upon 35% completion.[46] So Fontello dutifully asked for an inspection to approve the progress payment.[47] The inspector denied the progress payment because the work was not 35% completed. Mareno did some work to please the inspector and Fontello again called for the inspection but Fontello did not attend the scheduled inspection.

---

[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.* at A181.
[45] Motion Appendix. at A181.
[46] *Id.*
[47] *Id.*

Unknown to Fontello until much later, the inspector did not actually visit the property. Instead, Mareno spoke to him by phone. "He took Mario's word for it and said that Mario told him that there was rough-in electric, rough-in plumbing. The siding was ordered and going in the next week or so."[48] None of this was true, but the inspector approved the second draw of 35%.[49]

Mareno essentially disappeared after that. Caught between pursuing Mareno to honor his contract, the need to have a home to live in, the legal complication of needing to provide a home for their nephew, the dwindling reserves for a rental from the insurance company, Mareno's fraud visited a particularly acute difficulty for the Fontellos.[50] And as if these were not enough, the Fontellos discovered that Mareno had essentially gutted their one year old kitchen – which was not part of any plan – and removed their relatively new cabinets and appliances from the kitchen.[51] Some were eventually retrieved from a Mareno warehouse, but some were not.[52]

The Fontellos were forced to complete the repairs to their home on weekends and in their own spare time. Mareno had their money and he could not be found. They maxed out their credit cards and enlisted all the family support they could. At

---

[48] *Id.* at A182.
[49] *Id.*
[50] Motion Appendix. at A182.
[51] *Id.* at A183.
[52] *Id.*

the time of sentencing, their floors were still made of plywood and they still could not invite guests inside.[53]

As against all this, Mareno now claims that Fontello "was not 100% accurate."[54] Mareno claims he stopped because the insurance company stopped payments, as shown by emails in the record. The emails in the record, however do not show that. Indeed, there is nothing in the email record to support the proposition that Mareno did anything other than exactly what Mr. Fontello said he did: got the second draw and disappeared. The Court does not find that had Mr. Fontello been impeached with whatever is to be found of impeachable value in the emails in question, there is a reasonable probability that the sentence would have been different.

## CONCLUSION

Having reviewed each of Mareno's allegations of ineffective assistance of counsel, the Court makes one final observation. There may be a sentence imposed that is outside of a recommended sentence in a plea agreement. And when such a sentence is imposed, perhaps there is room to question whether different counsel, arguing different facts or law, might have influenced the sentencing court to impose less time. But sentencing is a core function of the judicial office and it is fair to

---

[53] *Id.* at A184.
[54] Petitioner's Motion. D.I. 56 at 26.

15

assume that the sentencing judge has considered all relevant facts in reaching the sentence conclusion.

Mareno knew when he took the plea that the State was recommending a sentence capped at 6 years of imprisonment. That is exactly what he got. An argument in post-conviction pleadings that trial counsel was ineffective for failing to put this or that fact before the Court is more suited to a case in which the defendant did not get the benefit of his bargain or the sentence was so far outside the sentencing guidelines as to call into question whether sentencing counsel may have missed something important. None of that happened here.

Mareno's motion for relief under Rule 61 is **DENIED**.

**IT IS SO ORDERED**.

Judge Charles E. Butler